UNITED STATES of America, Plaintiff,

v.

GUERLAIN, Inc., Defendant.

UNITED STATES of America, Plaintiff,

v.

PARFUMS CORDAY, Inc., Defendant.

UNITED STATES of America, Plaintiff,

v.

LANVIN PARFUMS, Inc., Defendant.

United States District Court
S. D. New York.

July 9, 1957.

Paul W. Williams, U. S. Atty., New York City, by Joe F. Nowlin, Washington, D. C., Richard B. O'Donnell, John D. Swartz and Paul D. Sapienza, Attys., U. S. Dept. of Justice, New York City, on the brief, for the United States.

Shearman, Sterling & Wright, New York City, by Charles C. Parlin, Jr., New York City, of counsel, for Guerlain, Inc.

Joseph L. Hochman, New York City, for Parfums Corday, Inc.

Jay Leo Rothschild, New York City, for Lanvin Parfums, Inc.

EDELSTEIN, District Judge.

In three separate but similar civil actions consolidated for trial to the court without a jury, the Government charges each of the three defendants with a violation of § 2 of the Sherman Act, 15 U.S.C. § 2, 15 U.S.C.A. § 2. There is no allegation of conspiracy. The defendants are American corporations[1] marketing trade-marked toilet goods[2] of better quality and relatively high price. Each of the American companies is closely associated with a French company that originated the trade name, first marketed products under the trade-marks and supplies the products, manufactured under secret formulae, sold by the American company, or the essential ingredients of those products. The Government alleges that, in each case, the American company and the French company constitute a single international enterprise. The toilet goods sold in the United States by the defendants are obtained from the French companies in packaged form ready for sale, or in bulk and bottled in the United States, or compounded in the United States by adding alcohol to the essences or concentrates obtained from the French company. These products are sold in the United States under trade-marks identical with those used by the French company upon similar products, and the advertising emphasizes the prestige factor of origin with Parisian perfumers.

In each case the French company has given to its associated American company an exclusive right to distribute its products in the United States and has transferred to the American company trade-mark rights intended to be sufficient to justify registration in the United States Patent Office on the basis of a claim of ownership by the American company.[3] And each of the defendants has filed with the Bureau of Customs, United States Treasury, certificates of registration of certain trade-marks for the purpose of preventing the competitive importation of products bearing those trade-marks without the written consent of the American registrant, under the terms of § 526 of the Tariff Act of 1930.[4]

The Government takes the position that such utilization of § 526 by each defendant is unwarranted and constitutes a violation of § 2 of the Sherman Act: an attempt to monopolize and a monopolization of the importation into and sale within the United States of these trade-marked products, by preventing the importation and reselling by others who purchase such goods from

---

1. Guerlain, Inc. and Parfums Corday, Inc. are organized under the laws of the State of New York and Lanvin Parfums, Inc. is organized under the laws of the State of Delaware.

2. The term "toilet goods" as defined in the complaint includes perfumes, colognes and toilet waters.

3. The Government does not, in these cases, challenge the right of the defendants to register their trade-marks with the Patent Office.

4. 46 Stat. 741, 19 U.S.C. § 1526, 19 U.S. C.A. § 1526.

the French company that forms but the foreign part of a single international enterprise with a defendant.

Most of the factual questions in the case were disposed of by stipulation and the remaining proof was largely documentary. Left for decision are the following issues: (1) the factual issue of whether for each defendant and its associated French company, there exists a single international enterprise; (2) the legal issue of whether, where such a single international enterprise is found, the American part of that enterprise may exclude the competitive importation of the trade-marked products sold abroad by the French part of the enterprise, under the provisions of § 526 of the Tariff Act of 1930; (3) the legal issue of whether, if a defendant is not authorized to exclude competitive imports under § 526, conduct in doing so constitutes monopolization under § 2 of the Sherman Act; and (4) involved in the legal issue of monopolization under the Sherman Act, the factual issue connected with the determination of the relevant market, the issue of the uniqueness of the defendant's products.

### 1. Relations between Defendants and Their Associated French Companies.

I have found as a fact in each case, beyond any gnawing doubt, that the defendant and its French counterpart constitute a single international enterprise. In order to avoid any undue extension of this opinion, reference is made to the appended specific findings of fact.[5] The defendants, with varying degrees of vigor, deny integral existence with their foreign associates, but an examination of the facts leaves the denials utterly unconvincing. The asserted independence is contrived and the "corporate veil" is easily pierced by the merest glance through the forms of the business organizations to the realities of the relationships. See United States v. Reading Co., 253 U.S. 26, 62–63, 40 S.Ct. 425, 64 L.Ed. 760.

### 2. § 526 of the Tariff Act of 1930.

■ The Government urges a construction of § 526 of the Tariff Act of 1930 that is not to be derived from a literal reading of the words of the statute. Subsection (a) of § 526 reads as follows:

"It shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trade-mark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent Office by a person domiciled in the United States, under the provisions of sections 81 to 109 of Title 15, and if a copy of the certificate of registration of such trade-mark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said Title 15, unless written consent of the owner of such trade-mark is produced at the time of making entry."

The Government contends that this provision may apply only to the advantage of an independent American trade-mark owner which may, by registering a trade-mark of a foreign producer in its own name, prevent the importation of authentic products by anyone else. But it is argued that the provision does not apply to the American part of a single international enterprise to enable it to prevent the importation into the United States of authentic products sold abroad by the foreign part of the enterprise. Despite the absence of specific language to that effect in the legislation, I am constrained to agree, in view of the litigated history of the issue involved and of the legislative history of the section.

5. In the Guerlain case, see Findings of Fact 13, 14, 15 and 16; in the Corday case, see Findings of Fact 15, 16, 17, 18 and 19; in the Lanvin case see Findings of Fact 12, 13, 14, 15 and 16.

The first statutory limitation on trademarks borne by imported articles was § 27 of the Trade-Mark Act of 1905 [6] which later became, substantially, § 42 of the Lanham Act.[7] Prior to 1905 it was held that a person who purchased exclusive United States rights to a trademark identifying imported merchandise did not have an infringement remedy against a competitor who imported goods bearing the same trade-mark bought from the foreign manufacturer. Apollinaris Co. v. Scherer, C.C.S.D.N.Y., 27 F. 18. After the enactment of § 27 of the 1905 Act, which prohibited the importation of merchandise bearing a mark "which shall copy or simulate a trade-mark registered in accordance with the provisions of this Act * * *", the same result was obtained, the section being restricted to spurious goods. Fred Gretsch Mfg. Co. v. Schoening, 2 Cir., 238 F. 780. The Court of Appeals for the Second Circuit followed these precedents in the case of Bourjois & Co. v. Katzel, 2 Cir., 275 F. 539, involving a French manufacturer of face powder which sold plaintiff its American business, including trade-marks. The plaintiff continued to import the French powder and to sell it in boxes similar to the French ones. The defendant purchased the same product from the French firm abroad and sold it in the original French boxes. The court held that there was no infringement. The case went to the Supreme Court which, after a considerable delay of decision, reversed the Court of Appeals, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464. In A. Bourjois & Co. v. Aldridge, 2 Cir., 292 F. 1013; 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501, the Court adhered to Katzel and held that where an American trade-mark was so infringed, the Collector of Customs was

required by § 27 of the Act of 1905 to exclude products with infringing marks.

However, prior to the decision of the Supreme Court in the Katzel case, § 526 of the Tariff Act of 1922,[8] currently § 526 of the Tariff Act of 1930, was passed by Congress. The record of the Congressional debate is brief, with the inclusion of § 526 being characterized as a "midnight amendment"[9] and with floor debate in the Senate limited to ten minutes.[10] Nevertheless, it appears from that debate that the purpose of the section was to protect the rights of Americans who bought foreign trade-marks and that it was aimed at the Katzel decision in the Court of Appeals, involving an American trade-mark owner independent of the foreign manufacturer.[11] That this was obviously the target of the legislation was pointed out by Judge Learned Hand in Coty, Inc., v. Le Blume Import Co., D.C.S.D.N.Y., 292 F. 264, 269, and by Judge Augustus N. Hand in Sturges v. Clark D. Pease, 2 Cir., 48 F.2d 1035, 1037.

The Supreme Court, in reversing the Court of Appeals in the Katzel case, did not refer to § 526. But one basis for the decision was that the defendant's use of the French trade-mark could harm the plaintiff's reputation, because the trade-mark so used in this country did not truly indicate the origin of the goods; for the trade-mark in the United States indicated that the goods came from the plaintiff. It can hardly be claimed by the defendants in the cases at bar that the trade-marks indicate an origin with them in the United States, inasmuch as the whole burden of their advertising is to emphasize French origin. A competing importer's identical toilet goods coming from the French part of the international enterprise could in no way harm

6. 33 Stat. 730.

7. 60 Stat. 440 (1946), 15 U.S.C. § 1124, 15 U.S.C.A. § 1124.

8. 42 Stat. 975.

9. 62 Cong.Rec. 11602.

10. Id. at 11585.

11. Id. at 11602–11605. However, the fact situation of the Katzel case was misrepresented to be a situation where the firm which sold the trade-mark rights was the one seeking to import the trade-marked product. Id. at 11605.

a defendant's good will and reputation, as was stated to be possible in the Katzel case.

■ The defendants press the legislative history of § 526 negatively. In 1954, certain proposals of the Treasury Department were introduced in Congress to prevent affiliated concerns from invoking the import prohibitions.[12] From the fact that the amendments were not enacted into law, the defendants argue that they, embodying substantially the Government's position in these cases, were "rejected" by Congress. But actually the proposals were withdrawn, and from this situation I am able to derive no ulterior significance. The reasons for the withdrawal are not clear,[13] and nothing appears to prevent a re-introduction [14] and possible future enactment. If the failure of enactment of every amendment offered for the consideration of Congress were necessarily held to shed light on the legislation sought to be amended, the search for Congressional intention would be endless and fruitless.[15]

But the defendants insist that it would destroy the very essence of the trademark and the property values represented by it to permit those who do not contribute to the good will, identified with the mark, nevertheless, to divert that good will to themselves, on a "free ride".

The argument is one for the protection of advertising expenditures and expected profits not necessarily related to good will. Obviously advertising is for the purpose of building good will, but the defendants make an exclusive American market an element of that good will. The exclusive right to sell in the American market on the part of an international concern exploiting world markets is not an element of good will except in so far as it may be made so artificially by import prohibitions. A competing importer selling identical merchandise under the same trade-mark would not be a "pirate" or a "cheat". The public would not be deceived about the authenticity or origin of the product and the reputation of the trade-mark owner could not suffer from the marketing of inferior merchandise under his mark. Even the trade-mark owner's advertising expenses bear fruit, in some measure, from the activities of the "free riders", for the international enterprise reaps some benefit from all sales.[16] That the defendants may be disappointed in their expectations of profit from an exclusive domestic market, after having made substantial expenditures for advertising, involves not the diversion of their good will or the repudiation of their trade-mark rights, but the denial of a special privilege. And I am not persuaded that it was the intention of Congress to grant such a special privilege for the benefit of an international enterprise.[17]

12. For the form of the proposed legislation, see Note 64 Yale L.J. 557 (1955) footnote 17 at page 560.

13. Counsel for the Government suggested at oral argument that at the time of the proposed amendments it was the purpose of the Administration to make a far-reaching customs simplification, and the sponsor of the amendments, the Treasury Department, withdrew them in order to avoid controversy that might becloud the Administration's purpose.

14. It was stated at oral argument that one or two further bills have been introduced at the present session of Congress.

15. See the dissenting opinion of Mr. Justice Frankfurter in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 397, 71 S.Ct. 745, 95 L.Ed. 1035. It was widely assumed for many years that the Miller-Tydings Amendment to § 1 of the Sherman Act, 50 Stat. 693, 15 U.S.C. § 1, 15 U.S.C.A. § 1, authorized State acts with "non-signer" provisions, and amendments offered to remove such presumed authorization failed of enactment. The Supreme Court held, nevertheless, that "non-signer" provisions were not authorized by the Miller-Tydings Amendment.

16. See Developments in the Law-Trade-Marks and Unfair Competition, 68 Harv. L.Rev. 814, 915-16 (1955).

17. "The rationale underlying trade-mark protection does not support the exclusion of genuine products by *independent*

■ Moreover, to ascribe such an intention to Congress would have the effect of reading into the legislation an implied exception to the Sherman Act. Indeed, the defendants maintain, as a reason why they should not be held in violation of the Sherman Act, that their conduct is under the legal license of § 526. Assuming a case where the products involved are unique so as to constitute a relevant market in themselves, a construction permitting the American part of a single international enterprise to exclude imports by purchasers from the foreign part of the enterprise would authorize monopolization by permitting a manufacturer to prevent purchasers of his merchandise from competing with him.[18] See United States v. Klearflax Linen Looms, D.C., 63 F.Supp. 32; cf. F.T.C. v. Beech-Nut Packing Co., 257 U. S. 441, 42 S.Ct. 150, 66 L.Ed. 307. But exemptions from the operation of the anti-trust laws are explicitly made by Congress,[19] and repeals by implication are not favored. "The intention of the legislature to repeal 'must be clear and manifest'. * * * There must be 'a positive repugnancy between the provisions of the new law, and those of the old; and even then the old law is repealed by implication only *pro tanto* to the extent of the repugnancy.'" United States v. Borden Co., 308 U.S. 188, 198–199, 60 S.Ct. 182, 188, 84 L.Ed. 181; State of Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051; United States Alkali Export Association, Inc., v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554. I find no "clear and manifest" intention on the part of Congress to limit the scope of the Sherman Act for the benefit of an international enterprise by means of § 526, and to construe that section in accordance with the purpose disclosed by the history detailed avoids a "positive repugnancy" in favor of a harmonious consistency between the two laws. See Takao Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199.

### 3. § 2 of the Sherman Act

■ The charge of illegal monopolization requires a finding of monopoly power and a finding of intent to monopolize, American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575, or, obviously, an actual exercise of the power. Inasmuch as monopoly power is "the power to control prices or exclude competition * * *", United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S. Ct. 994, 1005, 100 L.Ed. 1264, it must be determined by defining the market and assessing the defendant's power in that market. In the definition of the relevant market, the defendants maintain that the recent decision in the cellophane case, United States v. E. I. du Pont de Nemours & Co., supra, is dispositive. In that case the majority opinion stated: "[W]here there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from the others. If it were not so, only physically identical products would be a part of the market. * * * What is called for is an appraisal of the 'cross-elasticity' of demand in the trade."[20] "The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are

---

American trade-mark owners any more than it supports exclusion by related importers." Note, 64 Yale L.J. 557, 567 (1955). But § 526 was passed specifically to protect independent American trade-mark owners from the importation of authentic products.

18. See discussion under "§ 2 of the Sherman Act", *infra*.

19. For a listing of Acts containing specific exemptions from the antitrust laws, see United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, at page 388, 76 S.Ct. 994, 100 L.Ed. 1264, footnote 14.

20. United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 394, 76 S.Ct. 994, 1006, 100 L.Ed. 1264.

produced—price, use and qualities considered."[21] And it is argued that the defendants' products vie in a highly competitive market with each other and with similar products of numerous other manufacturers, products that are highly comparable and reasonably interchangeable for the purposes for which they are produced, considering price, use and quality.[22] It is therefore submitted that the cellophane case conclusively precludes the consideration of the trade-marked products of any one manufacturer as a relevant market.

But the du Pont case also pointed out that "[t]he varying circumstances of each case determine the result * * *",[23] citing in a footnote Maple Flooring Mfrs.' Ass'n v. United States, 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093:

> "It should be said at the outset, that in considering the application of the rule of decision in these cases to the situation presented by this record, it should be remembered that this court has often announced that each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and that the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied."

The product involved in the du Pont case, cellophane, was a raw material for use by manufacturers in packaging their products. In determining whether to use cellophane or some other flexible packaging material, manufacturers were guided by careful and objective considerations of utility and price. As the district court found in that case, a finding sustained by the Supreme Court, there was a great sensitivity of customers in the flexible packaging markets to price or quality changes. Thus, small variations in price or quality would induce a manufacturer to shift from one flexible packaging material to another, in accordance with a balance of all the utilities toward the achievement of the most efficient economic operation. But the products involved in the cases at bar do not compete with each other on such terms. Although each perfume is manufactured under a secret formula and possesses a distinctive fragrance, there is nevertheless undisputed testimony that many purchasers are unable to distinguish between the different scents of various perfumes. Indeed, Guerlain insists that it competes not only with other fragrances, but also with fragrances that an average customer could not distinguish from its products. For a good perfumer can, it appears, and frequently does come so close to reproducing another fragrance that the average person cannot distinguish between the two. There is even evidence in the record of expert difference of opinion in the classification of individual scents.

From these facts the defendants would draw the conclusion of the substantial fungibility of their products with innumerable others, so that the relevant market must be considered to constitute no one single brand but the aggregate of products of similar price and quality. But this conclusion, I feel, ignores certain other meaningful evidence, evidence that came from defendants' witnesses. This evidence supports the conclusion that the most important element in the

21. Id. 351 U.S. at page 404, 76 S.Ct. at page 1012.

22. About 90 different manufacturers sell over 408 perfumes of different names in the United States, and of these manufacturers, 61 sell toilet goods in the same price range as the toilet goods sold by the defendants. Based on retail sales prices, the total annual sale in the United States of toilet goods in the same price range as defendants' products is approximately $100,000,000, with $3,500,000 accounted for by Guerlain, $2,000,000 by Corday and $6,000,000 by Lanvin.

23. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 395, 76 S. Ct. 994, 1007, 100 L.Ed. 1264.

appeal of a perfume is a highly exploited trade-mark. There seems to be agreement that no quality perfume can be successfully marketed without a famous name. It would appear that, to a highly significant degree, it is the name that is bought rather than the perfume itself. This fact gives the market a rigidity not found in the cellophane case. In applying its test of market to cellophane, the Supreme Court said:

"An element for consideration as to cross-elasticity between products is the responsiveness of the sales of one product to price changes of the other. [Footnote omitted.] If a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between them; that the products compete in the same market."[24]

There is no evidence in the cases at bar on responsiveness of the sales of one product to the price changes of another. But there is evidence, not disputed, that the leading perfume of one of the defendants would not sell satisfactorily if offered under an unknown name without national advertising. There is agreement that this result would prevail for any quality perfume similarly offered. And it would be fair to conclude from the evidence that an unexploited product, packaged and merchandised without its trade-mark, would have a negligible effect on the sales of the same product, exploited and trade-marked, even though the former may be sold at a substantial price differential from the latter. The kind of cross-elasticity discussed by the Supreme Court in the cellophane case does not exist for perfumes bearing the names and trade-marks of the defendants. Objectively, the products may be more than reasonably interchangeable with others. But the lack of objectivity in consumer demand impairs the basis of interchangeability and negates a finding of cross-elasticity.

The cases at bar are distinguishable from the cellophane case, in the search for the relevant market, in another important particular. For in these cases the defendants conducted themselves in accordance with a specific intention to exclude competitors and to control prices. This consideration was absent from the du Pont case. Indeed, the Supreme Court distinguished this situation and said: "Illegal monopolies under § 2 may well exist over limited products in narrow fields where competition is eliminated."[25] In the footnote to that statement,[26] the cases set out as illustrative of the principle were (with one exception) attempt and conspiracy cases, rather than monopolization cases. The defendants have been charged with attempt to monopolize as well as with monopolization, but inasmuch as the attempts in the markets contended for by the Government have been completely successful, it is perhaps inaccurate to speak of attempts. Nevertheless, the cases are much more closely akin to attempt and conspiracy cases than they are to a monopolization case like the cellophane case. The most singular and certainly the most indisputable element in the cases is the intentional exclusion of potential competitors through the instrumentality of § 526. The exclusion of competition is the essence of monopoly. If my opinion about § 526 is correct, the defendants have intentionally and illegally excluded competition. The means were not illegal in the sense of immoral, predatory and bad faith practices familiar in many cases, but they were not "honestly industrial"[27] in that they were actuated solely by a desire to prevent competition. In cases where there is no specific intent to exclude competition, even maneuvers "honestly industrial" having an exclusionary effect may supply

24. Id., 351 U.S. at page 400, 76 S.Ct. at page 1010.

25. Id., 351 U.S. at page 395, 76 S.Ct. at page 1007.

26. Ibid. (footnote 23).

27. United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 431.

the requisite purpose and intent for a finding of monopolization,[28] though the market may not be narrowly defined. Where, however, exclusionary conduct demonstrates a specific intent to prevent competition, the analogy to the attempt and conspiracy cases is forceful. The fact that an attempt is successful is hardly reason to destroy the analogy, and a limited definition of the market is therefore appropriate. See Turner, Antitrust Policy and The Cellophane Case, 70 Harv.L.Rev. 281 (1956).

But the defendants cite two recently decided cases as holding that the product of a single manufacturer cannot constitute a relevant market. Schwing Motor Co. v. Hudson Sales Corp., D.C., 138 F.Supp. 899, affirmed per curiam, 4 Cir., 239 F.2d 176, and Webster Motor Car Co. v. Packard Motor Car Co., D.C., 135 F.Supp. 4, reversed, D.C.Cir., 243 F.2d 418.[29] The Schwing case, which was substantially followed by the Court of Appeals for the District of Columbia in the Webster case, involved an alleged combination or conspiracy by means of an agreement between an automobile manufacturer and a retail dealer, pursuant to which the manufacturer refused to renew expiring agreements with two other dealers, thus giving one dealer a "virtual monopoly" of the sale of one make of automobiles within one city. In the first place, it would seem that the element of cross-elasticity of demand for automobiles is much greater than for highly exploited, trade-marked perfumes, or that, in any event, the automobile market does not possess the rigidity of the quality perfume market, as discussed. But more significantly, Chief Judge Thomsen, whose opinion in the district court was adopted as the opinion of the

Court of Appeals for the Fourth Circuit, pointed out that every manufacturer has a natural and complete monopoly of his particular product, especially when sold under his own private brand or trade name, and he may sell his product as he chooses, exercising his own independent discretion about the parties with whom he will deal. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. He may reduce the number of his dealerships in any area and, obviously, if he chooses to do so he will discuss the matter with the dealer or dealers whom he wishes to retain. "To say that a manufacturer may legally decide to reduce the number of its dealers in a given area if it does not discuss the matter with the dealers beforehand, but violates the antitrust laws if it does discuss the matter with them before the new agreements are made, ignores the realities." [30] But Judge Thomsen went on to say that a horizontal arrangement between competitors to effect the same purpose would be invalid, for that would constitute a true conspiracy, notwithstanding that its subject matter would be a relatively minor brand, constituting about 2% of the automobiles sold in the city, in a highly competitive market. Nor could a manufacturer, without the element of conspiracy, seek to monopolize by preventing purchasers of his merchandise from competing with him. United States v. Klearflax Linen Looms, D.C., 63 F.Supp. 32; cf. F. T. C. v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307.[31] This situation does not present a case of the natural monopoly that a manufacturer has in his own product, but an extension of such a monopoly. Neither the Schwing case nor the Webster case involved an effort of a manufacturer to ex-

28. American Tobacco Co. v. United States, 328 U.S. 781, 813–814, 66 S.Ct. 1125, 90 L.Ed. 1575, quoting from the Alcoa case.

29. See also Arthur v. Kraft-Phenix Cheese Corp., D.C., 26 F.Supp. 824.

30. 138 F.Supp. at page 906; but see the dissent of Judge Bazelon in the Webster case, supra, in which he takes the position that the manufacturer's decision to

sell through an exclusive dealer is unlawful unless made unilterally.

31. The Beech-Nut case directly involved the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., and involved the Sherman Act indirectly in that the public policy embodied in that Act was considered in determining what were unfair methods of competition within the Federal Trade Commission Act.

tend the natural monopoly of his own product.

The defendants stress heavily the sentence in the cellophane case that the " * * * power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly." [32] But such power of the defendants over their trade-marked products is not here under attack. What is under attack is, in effect, an attempt (successfully executed) by each defendant, as a part of a single international business enterprise, to limit the resale of its products for the express purpose of excluding competition and controlling prices. Purchasers from the French part of the enterprise are prevented, by means of the utilization of § 526, from competing in the United States with the American part of the same enterprise. Such exclusion, if it were accomplished by agreement, would violate § 1 of the Sherman Act. For, "[a] distributor of a trademarked article may not lawfully limit by agreement, express or implied, the price at which or the persons to whom its purchaser may resell, except as the seller moves along the route which is marked by the Miller-Tydings Act." United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 721, 64 S.Ct. 805, 812, 88 L.Ed. 1024, quoted in United States v. McKesson & Robbins, 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209. These defendants have achieved the same result unilaterally, without agreement, with the effect of expanding their trade-mark monopolies beyond their proper scope. In the cellophane case there was no evidence that du Pont had attempted to control the use or resale of cellophane, and there is nothing in the case to indicate that the power of a manufacturer of a trademarked product may not be expanded into an illegal monopoly. It is in the context of the extension of a statutory monopoly into illegal proportions by deliberately exclusionary conduct that the relevant market must be defined.

█ With the relevant market defined as the trade-marked toilet goods of each defendant, there can be no doubt about the possession and exercise by each of them of monopoly power. Monopoly power is "the power to control prices or exclude competition." [33] That this power has been extensively utilized by the defendants is obvious. Each of them intentionally excludes potential competitors from dealing, in the United States, in the products sold abroad by the French part of its enterprise. The result has been the maintenance of substantial price differentials in the United States and in France—price levels so different that the removal of their artificial protection would threaten defendants' American monopolies. For it is clear that the price differentials are sufficient to make competitive dealing in these products profitable. The defendants argue the inaccuracy of this conclusion by citing the cost of promotional and administrative expenses of their American businesses, expenses that largely make up the price differentials, and without which there could be no profitable business in any event. But the evidence of these expenses, admitted upon the trial, I now find to be irrelevant. If price differentials may not be maintained under the Sherman Act by means of the exclusion of competition, the expenses that the defendants choose to undertake may not be offered in exculpation. The economic justification of expenses furnishes no legal justification for price differentials resulting from an illegal monopoly.

█ Accordingly, I append findings of fact and conclusions of law separately in each case, substantially as submitted by the Government, holding that each defendant is in violation of § 2 of the Sherman Act, entitling the Government to relief in the form of an order enjoining the

---

32. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 393, 76 S. Ct. 994, 1006, 100 L.Ed. 1264.

33. Id., 351 U.S. at page 391, 76 S.Ct. at page 1005.

continuation of the conduct constituting the violation. Proposed decrees may be filed within 30 days from the date of the filing of this opinion and a hearing will thereafter be scheduled upon due notice.

### United States v. Guerlain, Inc.
### Findings of Fact

1. The defendant in this action, Guerlain, Inc., hereinafter referred to as "American Guerlain", is a New York corporation with its principal place of business within the Borough of Manhattan, New York City.

2. American Guerlain transacts business within the Southern District of New York and is found therein.

3. The acts hereafter found to have been done by American Guerlain were authorized, ordered or done by officers, agents or employees of American Guerlain.

4. The term "toilet goods", as used herein, comprehends perfumes, colognes and toilet waters. Not less than 90% of the business of American Guerlain is in the sale and distribution of distinctive lines of such toilet goods, which are obtained, processed and packaged as found hereafter (Findings 5 and 6). These distinctive lines of toilet goods are sold and distributed by American Guerlain from its place of business in New York City to retailers and other customers located throughout the United States. American Guerlain markets its distinctive lines of toilet goods under various United States trade-marks, hereinafter referred to as "Guerlain United States trade-marks", which are registered in the United States Patent Office under its name.

5. All perfumes sold and distributed in the United States by American Guerlain are manufactured in France by Societe Guerlain of Paris, France, a "Societe en Nom Collectif" under the laws of France, hereinafter referred to as "French Guerlain". American Guerlain obtains these perfumes from French Guerlain, imports them into the United States and packages them in containers obtained in the United States for sale and distribution throughout the United States.

6. The colognes and toilet waters sold in the United States by American Guerlain are prepared by blending alcohol with essences obtained from French Guerlain and imported from France. The distinctive character and quality of a cologne or toilet water is governed by the essence used and the proportion in which it is combined with alcohol, since the alcohol is substantially uniform in quality and character as used in toilet goods of comparable quality. These essences are manufactured from flower oils and other fragrance products in accordance with secret formulae and, when combined with alcohol in appropriate proportions, impart the characteristic and distinctive fragrance to the colognes and toilet waters processed by American Guerlain. Colognes and toilet waters prepared in this manner by American Guerlain are packaged in containers obtained in the United States for sale and distribution throughout the United States.

7. A substantial quantity of the toilet goods sold by American Guerlain in the United States bear the same trade-marks as are borne by a substantial quantity of toilet goods sold elsewhere by French Guerlain. The trade-marked toilet goods sold by French Guerlain in foreign countries and those sold by American Guerlain in the United States are hereinafter referred to as "Guerlain toilet goods".

8. All Guerlain toilet goods bearing a particular trade-mark are substantially identical in character and quality, whether sold in the United States by American Guerlain or sold elsewhere by French Guerlain. Trade-marks used both on goods sold in the United States by American Guerlain and on goods sold elsewhere by French Guerlain include "Shalimar", "Vol de Nuit", "L'Heure Bleue" and "Mitsouko".

9. Guerlain toilet goods, whether sold abroad or within the United States, are manufactured in accordance with secret formulae and possess characteristics which distinguish them from all other

toilet goods. The principal such characteristic in a given line of Guerlain toilet goods is the fragrance common to that line. In the United States and elsewhere this fragrance is customarily described by the particular trade-mark exclusively referrable to the line characterized by the fragrance.

10. Guerlain toilet goods are distinguished from all other toilet goods by the characteristics heretofore described in Findings 8 and 9, and are further distinguished by the Guerlain trade-marks which they bear. Toilet goods of this character are sold by means of extensive and intensive advertising which creates consumer preferences based in large part upon considerations other than the physical quality and character of the goods. Consumers, many of them unable to distinguish fragrances sold by Guerlain from somewhat similar fragrances sold by others, are induced to purchase Guerlain toilet goods by means of this advertising. Guerlain trade-marked toilet goods are thus distinguished in the minds of their consumer from other toilet goods.

11. Each line of Guerlain toilet goods, although to some extent competitive with somewhat similar toilet goods sold by other companies, constitutes a separate market for toilet goods to the extent that customers are influenced by a preference for distinctive Guerlain toilet goods bearing unique Guerlain trade-marks. Guerlain toilet goods could not be marketed successfully at present price levels without the consumer preference based upon association of the goods with Guerlain trade-marks. Without a Guerlain trade-mark, toilet goods manufactured by French Guerlain and identical with toilet goods sold by American Guerlain would not sell in the United States in quantities and at prices comparable to those of Guerlain toilet goods sold under Guerlain trade-marks.

12. Each line of Guerlain toilet goods has a protected market in the United States to the extent of the advantage created by the trade-mark monopoly of American Guerlain in Guerlain trade-marks.

13. A contract dated February 11, 1949, between American Guerlain and Guerlain Perfumery Corporation (of Delaware), a wholly-owned subsidiary of French Guerlain, gives Guerlain Perfumery Corporation effective control of American Guerlain with respect to Guerlain trade-marks used by American Guerlain in the marketing of toilet goods. The contract provides that American Guerlain will not use, register, transfer, sell or assign any of the listed Guerlain trade-marks without the prior written consent of Guerlain Perfumery Corporation, and further provides that if, for any reason, American Guerlain ceases or discontinues the business of distributing goods obtained from French Guerlain, American Guerlain will transfer its Guerlain trade-mark rights to the Guerlain Perfumery Corporation. This contract may be canceled by Guerlain Perfumery Corporation upon ninety days notice to American Guerlain; no privilege of cancellation is reserved to American Guerlain.

14. French Guerlain may, at its unrestricted option, cease supplying American Guerlain with Guerlain toilet goods at the end of any year, under the terms of an agreement expressed in a letter dated April 22, 1955 from French Guerlain to American Guerlain and a letter in reply thereto from American Guerlain to French Guerlain, dated June 9, 1955.

15. American Guerlain, in deciding upon its action on the exclusion from importation into the United States of Guerlain toilet goods purchased in France from French Guerlain, accommodated its policies in this matter to the desires of French Guerlain.

16. American Guerlain is in fact controlled by French Guerlain, under the terms of the contracts described in Findings 13 and 14 and the two companies are component parts of a single international business enterprise engaged in manufacturing and marketing Guerlain toilet goods.

17. American Guerlain markets within the United States an annual volume of Guerlain toilet goods amounting to approximately $3,500,000 at prevailing retail prices.

18. American Guerlain has filed with the Bureau of Customs, United States Treasury Department, certificates of trade-mark registration for the following trade-marks: "Apres l'Ondee", "L'Heure Bleue", "Guerlain", "Mitsouko", "Shalimar" and "Vol de Nuit". The defendant filed these certificates with a request for treatment of the listed trade-marks under § 526 of the Tariff Act of 1930 and regulations pertaining thereto with the intent and for the purpose of excluding from importation into the United States Guerlain toilet goods manufactured, sold and distributed abroad by French Guerlain without the prior written consent of American Guerlain.

19. Prior to July 25, 1950, American Guerlain transmitted to the Bureau of Customs, United States Treasury, its written consent to the importation into the United States of toilet goods bearing Guerlain trade-marks limited to one bottle of each perfume bearing each trade-mark, and one package or container of each toilet preparation other than perfume, when imported by a person arriving in the United States as a passenger from abroad. No consent was given to any importation other than in the baggage of persons entering the United States. This consent was given for the trade-marks "Apres l'Ondee", "L'Heure", "Guerlain", "Mitsouko", "Shalimar" and "Vol de Nuit". Between July 25, 1950 and March 29, 1954, such written consent was filed with the Customs Bureau for Guerlain trade-marked goods under the mark "Mitsouko", subject to the same limitations. These consents were given for the purpose of permitting limited importation by tourists and at the same time prohibiting importation in any quantity large enough to constitute a competitive threat to the exclusive distributorship of American Guerlain.

20. As a result of the acts described in Findings 18 and 19, Guerlain toilet goods manufactured, sold and distributed abroad by French Guerlain have been and are being excluded from importation into and resale within the United States by persons other than American Guerlain, except in quantities too small to constitute a competitive threat. This has been and is being done with the intent and for the purpose of protecting from competition American Guerlain's monopoly of Guerlain toilet goods in the United States.

21. Retail selling prices of Guerlain toilet goods are substantially lower in France than the prices for identical goods bearing identical trade-marks sold by American Guerlain in the United States. This difference in price levels is substantially greater than the costs, including duty, transportation and other costs that would be incurred in importing goods sold by French Guerlain in France into the United States. At present price levels, and in the absence of the present exclusion from importation of such goods, American merchants could obtain Guerlain toilet goods directly from France at a cost substantially lower than the cost for which such goods can be obtained through American Guerlain in the United States, and it would be economical for American consumers who desire to do so to purchase Guerlain toilet goods by mail order from France.

Conclusions of Law

1. This Court has jurisdiction over the subject matter of and the parties to this action.

2. The defendant American Guerlain, by means of the utilization of § 526 of the Tariff Act of 1930 (19 U.S.C. § 1526, 19 U.S.C.A. § 1526), has been and is excluding potential competition in the sale of Guerlain toilet goods in interstate and foreign commerce by preventing the importation of toilet goods bearing Guerlain trade-marks and manufactured, sold and distributed by French Guerlain abroad. This has been and is being done with the intent and for the purpose of excluding potential competition in such interstate and foreign trade and commerce

in Guerlain toilet goods in order to maintain existing price levels in the United States and to prevent others from selling and distributing Guerlain toilet goods in the United States.

3. Section 526 of the Tariff Act of 1930 does not grant an American company which is a part of a single international business enterprise with a foreign company any protection from competition by exclusion from importation of goods manufactured, sold and distributed abroad by the foreign part of such an international business enterprise, when such goods originating with such foreign company bear the same trade-marks as goods manufactured, sold and distributed in the United States by the American Company.

4. The exclusion by American Guerlain of goods manufactured, sold and distributed by French Guerlain and bearing the same trade-marks as those used by American Guerlain for the purpose of excluding competition and controlling price levels is a monopolization and an attempt to monopolize interstate and foreign trade and commerce in Guerlain toilet goods in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, 15 U.S.C.A. § 2.

5. Plaintiff is entitled to relief in the form of an order enjoining the continuation of the conduct heretofore described.

United States v. Parfums Corday, Inc.

### Findings of Fact

1. The defendant in this action, Parfums Corday, Inc., hereinafter referred to as "American Corday", is a New York corporation with its principal place of business within the Borough of Manhattan, New York.

2. American Corday transacts business within the Southern District of New York and is found therein.

3. The acts hereafter found to have been done by American Corday were authorized, ordered or done by officers, agents or employees of American Corday.

4. The term "toilet goods", as used herein, comprehends perfumes, colognes and toilet waters. Not less than 90% of the business of American Corday is in the sale and distribution of distinctive lines of such toilet goods, which are obtained, processed and packaged as found hereafter (Findings 5, 6 and 7). These distinctive lines of toilet goods are sold and distributed by American Corday from its place of business in New York City to retailers and other customers located throughout the United States. American Corday markets its distinctive lines of toilet goods under various United States trade-marks, hereinafter referred to as "Corday United States trade-mark", which are registered in the United States Patent Office under its name.

5. Some of the toilet goods sold by American Corday under Corday United States trade-marks are manufactured in France by Parfumerie Internationale Corday, a French corporation, of Paris, France, hereinafter referred to as "French Corday", and are purchased from French Corday, imported into the United States and sold by American Corday in the original packages in which they were packed by French Corday.

6. Some of the toilet goods sold by American Corday under Corday United States trade-marks are manufactured in France by French Corday, purchased from French Corday by American Corday, imported in bulk and packaged in the United States.

7. All Corday toilet goods not obtained as described in Findings 5 and 6 are compounded in the United States from materials which include as essential ingredients fragrant oils or essences, about 60% of which are obtained by American Corday from French Corday. The essences not obtained from French Corday are compounded from the same ingredients as would have been used by French Corday to produce the same essence, and the resulting product is of the same quality and character as would have been used by French Corday in manufacturing an essence of the same fragrance.

8. The colognes and toilet waters sold in the United States by American Cor-

day are prepared by blending alcohol with essences obtained from France. The distinctive character and quality of a cologne or toilet water is governed by the essence used and the proportion in which it is combined with alcohol, since the alcohol is substantially uniform in quality and character as used in toilet goods of comparable quality. These essences are manufactured from flower oils and other fragrance products and when combined with alcohol in appropriate proportions, impart the characteristic and distinctive fragrance to the colognes and toilet waters processed by American Corday. Colognes and toilet waters prepared in this manner by American Corday are packaged in containers obtained in the United States for sale and distribution throughout the United States.

9. A substantial quantity of the toilet goods sold by American Corday in the United States bear the same trade-marks as are borne by a substantial quantity of toilet goods sold elsewhere by French Corday. The trade-marked toilet goods sold by French Corday in foreign countries and those sold by American Corday in the United States are hereinafter referred to as "Corday toilet goods".

10. All Corday toilet goods bearing a particular trade-mark are substantially identical in character and quality, whether sold in the United States by American Corday or sold in France by French Corday. Trade-marks used both on goods sold in the United States by American Corday and on goods sold in France by French Corday include "Tourjours Moi", "Tourjours Toi", "Zigane", "Possession", "Orchidee Bleue", "Fame" and "Jet".

11. Corday toilet goods, whether sold in France or in the United States, are manufactured in accordance with secret formulae and possess unique characteristics which distinguish them from all other toilet goods. The principal such characteristic in a given line of toilet goods is the fragrance common to that line. In the United States and elsewhere that fragrance is customarily described by the particular trade-mark exclusively referrable to the line characterized by the fragrance.

12. Corday toilet goods are distinguished from all other toilet goods by the characteristics heretofore described in Findings 7, 8 and 11, and are further distinguished by the Corday trade-marks they bear. Toilet goods of this character are sold by means of extensive and intensive advertising which creates consumer preferences based in large part upon considerations other than the physical quality and character of the goods. Consumers, many of them unable to distinguish fragrances sold by Corday from somewhat similar fragrances sold by others, are induced to purchase Corday toilet goods by means of this advertising. Corday trade-marked toilet goods are thus distinguished in the minds of their consumers from other toilet goods.

13. Each line of Corday toilet goods, although to some extent competitive with somewhat similar toilet goods sold by other companies, constitutes a separate market for toilet goods to the extent that customers are influenced by a preference for distinctive Corday toilet goods bearing unique Corday trade-marks. Corday toilet goods could not be marketed successfully at present price levels without the consumer preference based upon association of the goods with Corday trade-marks. Without a Corday trade-mark, toilet goods manufactured by French Corday and identical with toilet goods sold by American Corday would not sell in the United States in quantities and at prices comparable to those of Corday toilet goods sold under Corday United States trade-marks.

14. Each line of Corday toilet goods has a protected market in the United States to the extent of the advantage created by the trade-mark monopoly of American Corday in Corday trade-marks.

15. Benson Storfer owns all of the common stock of American Corday. Storfer's ownership of this stock is not subject to any encumbrance, pledge, trust, agreement or other limitation upon the free exercise of his rights to beneficial ownership and control of American

Corday. Benson Storfer is also the president and secretary of American Corday and one of the four directors, the others being his wife and two sons.

16. American Corday owns 750 of the 800 shares of the voting stock of French Corday. Benson Storfer owns 10 shares of that stock, and each of his sons, Herbert and Fred Storfer, owns 10 shares. The ownership of these 780 shares of the French Corday voting stock is not subject to any encumbrance, pledge, trust, agreement or other limitation upon the free exercise of the rights of the owner of record to share in the beneficial ownership and control of French Corday.

17. In 1937 American Corday and French Corday entered into a contract by which American Corday was to have exclusive rights to distribute Corday toilet goods in the United States for a term of 10 years. Although that agreement has never been extended, renewed or replaced by another formal agreement, the two companies have continued their relationship to the present time.

18. The defendant American Corday, because of its relationship with French Corday, has furnished a guaranty to the Chase National Bank of certain of the financial obligations of French Corday. That guaranty has continued in effect to the present time.

19. As a result of the facts found in Findings 15, 16, 17 and 18, American Corday controls French Corday, and the two companies are parts of a single international business enterprise engaged in manufacturing and marketing Corday toilet goods.

20. The defendant American Corday has for many years prior to the filing of the complaint herein filed certificates with the Bureau of Customs, United States Treasury, purporting to show its ownership of certain Corday trade-marks, and thereby has caused the Customs Bureau to prevent the importation of any toilet goods described in these certificates without the written consent of American Corday. These certificates were filed with the intent and for the purpose of excluding from importation into the United States Corday toilet goods manufactured, sold and distributed abroad by French Corday without the prior written consent of American Corday.

21. Since 1950, and continuing to the present time, defendant American Corday, for toilet goods bearing the trade-mark "Corday" and any of the Corday trade-marks "Tourjours Moi", "Fame" and "Femme du Jour", has filed documents with the Bureau of Customs, United States Treasury, authorizing the Bureau of Customs to permit each individual entering the United States to import Corday toilet goods in quantities limited to one bottle of each perfume bearing a Corday trade-mark and one package or container of each preparation other than perfume bearing a Corday trade-mark. The importation of such toilet goods in excess of this quantity is prohibited in the absence of a specific individual written consent furnished by American Corday. The limited general consent for the importation of one package of goods was given for the purpose of permitting such limited importation by tourists, and at the same time prohibiting importation in any quantity large enough to constitute a competitive threat to the exclusive distributorship of American Corday.

22. As a result of the acts described in Findings 20 and 21, Corday toilet goods manufactured, sold and distributed abroad by French Corday have been and are being excluded from importation into and resale within the United States by persons other than American Corday, except in quantities too small to constitute a competitive threat. This has been and is being done by defendant for the purpose of protecting from competition American Corday's monopoly of Corday toilet goods in the United States.

23. Retail selling prices of Corday toilet goods are substantially lower in France than the prices for identical goods bearing identical trade-marks sold by American Corday in the United States. This difference in price levels is substantially greater than the cost, including

duty, transportation and other costs, that would be incurred in importing goods sold by French Corday in France into the United States. At present price levels and in the absence of the present exclusion from importation of such goods, American merchants could obtain Corday toilet goods directly from France at a cost substantially lower than the cost for which such goods can be obtained through American Corday in the United States, and it would be economical for American consumers who desire to do so to purchase Corday toilet goods by mail order from France.

24. American Corday markets within the United States an annual volume of Corday toilet goods amounting to approximately $2,000,000 at prevailing retail prices.

### Conclusions of Law

1. This Court has jurisdiction over the subject matter and the parties to this action.

2. The defendant American Corday, by means of the utilization of § 526 of the Tariff Act of 1930 (19 U.S.C. § 1526, 15 U.S.C.A. § 1526), has been and is excluding potential competition in the sale of Corday toilet goods in interstate and foreign commerce by preventing the importation of toilet goods bearing Corday trade-marks and manufactured, sold and distributed by French Corday abroad. This has been and is being done with the intent and for the purpose of excluding potential competition in such interstate and foreign trade and commerce in Corday toilet goods in order to maintain existing price levels in the United States and to prevent others from selling and distributing Corday toilet goods in the United States.

3. Section 526 of the Tariff Act of 1930 does not grant an American company, which is a part of a single international business enterprise with a foreign company, any protection from competition by exclusion from importation of goods manufactured, sold and distributed abroad by the foreign part of such an international business enterprise, when

such goods bear the same trade-marks as goods sold and distributed in the United States by the American company.

4. The exclusion by American Corday of goods manufactured, sold and distributed by French Corday, and bearing the same trade-marks as those used by American Corday, for the purpose of excluding competition and controlling price levels is a monopolization and an attempt to monopolize interstate and foreign trade and commerce in Corday toilet goods, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, 15 U.S.C.A. § 2.

5. Plaintiff is entitled to relief in the form of an order enjoining the continuing of the conduct heretofore described.

### United States v. Lanvin Parfums, Inc.
### Findings of Fact

1. The defendant in this action, Lanvin Parfums, Inc. hereinafter referred to as "American Lanvin", is a Delaware corporation with its principal place of business within the Borough of Manhattan, New York City.

2. American Lanvin transacts business within the Southern District of New York and is found therein.

3. The acts hereafter found to have been done by American Lanvin were authorized, ordered or done by officers, agents or employees of American Lanvin.

4. The term "toilet goods", as used herein comprehends perfumes, colognes and toilet waters. Not less than 90% of the business of American Lanvin is in the sale and distribution of distinctive lines of such toilet goods, which are obtained, processed and packaged as found hereafter (Findings 5 and 6). These distinctive lines of toilet goods are sold and distributed by American Lanvin from its place of business in New York City to retailers and other customers located throughout the United States. American Lanvin markets its distinctive lines of toilet goods under authorized United States trade-marks, hereinafter referred to as "Lanvin United States trade-marks", which are registered in

the United States Patent Office under its name.

5. All perfumes sold and distributed in the United States by American Lanvin are manufactured and packaged in France by Lanvin-Parfums, S.A., a French corporation of Paris, France, hereinafter referred to as "French Lanvin". American Lanvin obtains these perfumes from French Lanvin and imports them into the United States for sale and distribution throughout the United States.

6. The colognes and toilet waters sold in the United States by American Lanvin are prepared by blending alcohol with essences obtained from French Lanvin and imported from France. The distinctive character and quality of a cologne or toilet water is governed by the essence used and the proportion in which it is combined with alcohol, since the alcohol is substantially uniform in quality and character as used in toilet goods of comparable quality. These essences are manufactured from flower oils and other fragrance products in accordance with secret formulae and when combined with alcohol in appropriate proportions impart characteristic and distinctive fragrance to the colognes and toilet waters processed by American Lanvin. Colognes and toilet waters prepared in this manner by American Lanvin are packaged in the United States for sale and distribution throughout the United States by American Lanvin.

7. A substantial quantity of the toilet goods sold by American Lanvin in the United States, its possessions and Canada, bear the same Lanvin trade-marks as are borne by a substantial quantity of toilet goods sold by French Lanvin elsewhere. Lanvin toilet goods bearing a particular trade-mark are substantially identical in character and quality, whether sold in the United States, its possessions and Canada by American Lanvin or sold elsewhere by French Lanvin. Trade-marks used both on goods sold in the United States, its possessions and Canada by American Lanvin, and elsewhere by French Lanvin include "Scandal", "My Sin", "Rumeur", "Pretexte", "Arpege" and "Lanvin" (as it appears on labels of Eau de Lanvin).

8. Lanvin toilet goods, whether sold in France or in the United States, are manufactured in accordance with secret formulae and possess unique characteristics which distinguish them from all other toilet goods. The principal such characteristic in a given line of such toilet goods is the fragrance common to that line. In the United States and elsewhere that fragrance is customarily described by the particular trade-mark exclusively referrable to the line characterized by the fragrance.

9. Lanvin toilet goods are distinguished from all other toilet goods by the characteristics heretofore described in Findings 6, 7 and 8, and are further distinguished by the Lanvin trade-marks they bear. Toilet goods of this character are sold by means of extensive and intensive advertising which creates consumer preference based in large part upon considerations other than the physical quality and character of the goods. Consumers, many of them unable to distinguish fragrance sold by Lanvin from somewhat similar fragrance sold by others, are induced to purchase Lanvin toilet goods by means of this advertising. Lanvin trade-marked toilet goods are thus distinguished in the minds of their consumers from all other toilet goods.

10. Each line of Lanvin toilet goods, although to some extent competitive with somewhat similar toilet goods sold by other companies, constitutes a separate market for toilet goods to the extent that customers are influenced by a preference for distinctive Lanvin toilet goods bearing unique Lanvin trade-marks. Lanvin toilet goods could not be marketed successfully at present price levels without customer preferences based upon association of the goods with Lanvin trade-marks. Without a Lanvin trade-mark, toilet goods manufactured by French Lanvin identical with toilet goods sold by American Lanvin could not be sold in the United States in quantities and at prices comparable to those of

Lanvin toilet goods sold under Lanvin United States trade-marks.

11. Each line of Lanvin toilet goods has a protected market in the United States to the extent of the advantage created by the trade-mark monopoly of American Lanvin and Lanvin trade-marks.

12. The owner of record of all of the common stock of American Lanvin is Edouard L. Cournand. Cournand acquired this ownership of record under the terms of a "stock purchase agreement" dated June 21, 1946. The purchase price recited in that agreement was $100. Under the provisions of the agreement, Cournand was obliged to terminate the business of the company in Lanvin toilet goods, and to change the name American Lanvin so as to exclude therefrom the word Lanvin, if for any reason the merchandise agreements or the intangible assets agreement between American Lanvin and French Lanvin were terminated. The termination of either of those agreements would render the common stock in American Lanvin worthless. The stock purchase agreement also precluded Cournand from disposing of his stock or voting it in favor of any proposal to merge the company with any other organization or to sell any part of its assets.

13. The merchandise agreements between American Lanvin and French Lanvin, the first dated November 16, 1946 and the second dated January 5, 1953, prescribe the terms under which American Lanvin purchases Lanvin toilet goods from French Lanvin. Under the agreement now in effect Cournand must retain his ostensible majority ownership of the common stock of American Lanvin, and the agreement will terminate if Cournand ceases to be the chief executive officer of American Lanvin. American Lanvin is required to deal exclusively in the products of French Lanvin and to conduct all of its merchandising in a manner satisfactory to French Lanvin failing which French Lanvin may terminate the agreement.

14. The intangible assets agreements, the first, with French Lanvin, dated November 16, 1946, the second, with Renacimiento, dated "as of" November 18, 1946, and the third, with Coverep, C.A., dated March 25, 1953, control the manner in which American Lanvin may use Lanvin trade-marks. These agreements, like the merchandise agreements, are conditioned upon American Lanvin associating Lanvin trade-marks with goods supplied by French Lanvin in a manner satisfactory to French Lanvin. If American Lanvin. fails to conduct its business in a manner .satisfactory to French Lanvin or its Venezuelan affiliate, or if the merchandise agreement is terminated for any reason, the intangible assets agreement will terminate. Termination of the intangible assets agreement would require American Lanvin to release and reassign all its Lanvin trade-marks to Coverep, C.A. Such termination would effectively destroy the business of American Lanvin and render its common stock worthless.

15. American Lanvin, in deciding upon its action on the exclusion from importation into the United States of Lanvin toilet goods purchased in France from French Lanvin, accommodated its policies in this matter to the desires of French Lanvin.

16. As a result of the facts found in Findings 12, 13, 14 and 15, French Lanvin effectively controls American Lanvin in the management of its business as well as in the nature and quality of the products sold by American Lanvin under Lanvin trade-marks. American Lanvin and French Lanvin are parts of a single international business enterprise engaged in manufacturing and marketing Lanvin toilet goods.

17. American Lanvin has for many years prior to the filing of the complaint herein filed certificates with the Bureau of Customs, United States Treasury, purporting to show its ownership of certain Lanvin trade-marks, and thereby has caused the Customs Bureau to prevent the importation of any toilet goods described in these certificates without the

written consent of American Lanvin. These certificates were filed with the intent and for the purpose of excluding from importation into the United States Lanvin toilet goods manufactured, sold and distributed abroad by French Lanvin without the prior written consent of American Lanvin.

18. Since 1950, and continuing to the present time, defendant American Lanvin, for toilet goods bearing the trade-mark "Lanvin", and any of the Lanvin trade-marks "Pretexte", "Petales Froisses", "Arpege", "Scandal", "My Sin" and "Remeur", has filed documents with the Bureau of Customs, United States Treasury, authorizing the Bureau of Customs to permit each individual entering the United States to import Lanvin toilet goods in quantities limited to one bottle of each perfume bearing a Lanvin trade-mark and one package or container of each preparation other than perfume bearing a Lanvin trade-mark. The importation of such toilet goods in excess of this quantity is prohibited in the absence of a specific individual written consent furnished by American Lanvin. The limited general consent for the importation of one package of each kind of goods was given for the purpose of permitting such limited importation by tourists, and at the same time prohibiting importation in any quantity large enough to constitute a competitive threat to the exclusive distributorship of American Lanvin.

19. As a result of the acts described in Findings 17 and 18, Lanvin toilet goods manufactured, sold and distributed abroad by French Lanvin have been and are being excluded from importation into and resale within the United States by persons other than American Lanvin, except in quantities too small to constitute a competitive threat. This has been and is being done by defendant for the purpose of protecting from competition American Lanvin's monopoly of Lanvin toilet goods in the United States.

20. Retail selling prices of Lanvin toilet goods are substantially lower in France than the prices for identical goods bearing identical trade-marks sold by American Lanvin in the United States. This difference in price levels is substantially greater than the cost, including duty, transportation and other costs, that would be incurred in importing goods sold by French Lanvin in France into the United States. At present price levels and in the absence of the present exclusion from importation of such goods, American merchants could obtain Lanvin toilet goods directly from France at a cost substantially lower than the cost for which such goods can be obtained through American Lanvin in the United States, and it would be economical for American consumers who desire to do so to purchase Lanvin toilet goods by mail order from France.

21. American Lanvin markets within the United States an annual volume of Lanvin toilet goods amounting to approximately $6,000,000 at prevailing retail prices.

### Conclusions of Law

1. This Court has jurisdiction over the subject matter of and the parties to this action.

2. The defendant American Lanvin, by means of the utilization of § 526 of the Tariff Act of 1930 (19 U.S.C. § 1526, 19 U.S.C.A. § 1526), has been and is excluding potential competition in the sale of Lanvin toilet goods in interstate and foreign commerce by preventing the importation of toilet goods bearing Lanvin trade-marks and manufactured, sold and distributed by French Lanvin abroad. This has been and is being done with the intent and for the purpose of excluding potential competition in such interstate and foreign trade and commerce in Lanvin toilet goods in order to maintain existing price levels in the United States and to prevent others from selling and distributing Lanvin toilet goods in the United States.

3. Section 526 of the Tariff Act of 1930 does not grant an American company, which is a part of a single international business enterprise with a for-

eign company, any protection from competition by exclusion from importation of goods manufactured, sold and distributed abroad by the foreign part. of such an international business enterprise, when such goods bear the same trade-marks as goods sold and distributed in the United States by the American company.

4. The exclusion by American Lanvin of goods manufactured, sold and distributed by French Lanvin, and bearing the same trade-marks as those used by American Lanvin, for the purpose of excluding competition and controlling price levels is a monopolization and an attempt to monopolize interstate and foreign trade and commerce in Lanvin toilet goods, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, 15 U.S.C.A. § 2.

5. Plaintiff is entitled to relief in the form of an order enjoining the continuing of the conduct heretofore described.