SAXLEHNER v. EISNER & MENDELSON CO.    SAME v. SIEGEL–COOPER
CO.    SAME v. GIES.    SAME v. MARQUET.

(Circuit Court of Appeals, Second Circuit.    January 5, 1899.)

Nos. 86–89.

TRADE MARKS AND LABELS—ABANDONMENT.

> The owner of wells of bitter water in Hungary, which water was sold
> in Europe under the name of "Hunyadi Janos," by contract gave to a
> corporation the exclusive right to sell the same in this country, at the
> same time adopting a red and blue label for the bottles, containing a no-
> tice, signed by himself, that imitations would be the subject of legal
> proceedings by the corporation.    For several years the company sold
> large quantities here, until the name had in fact become an established
> trade mark of the water, and the red and blue labels its distinctive trade
> dress.    For some eight or ten years prior to the commencement of the
> present suit, however, other Hungarian waters had been sold in this
> country, the importers using the word "Hunyadi" as a part of the name,
> and in some cases under red and blue labels closely imitating those of the
> Hunyadi Janos.    Two suits were brought by the company to enjoin the
> use of the name "Hunyadi," which were discontinued, and the importa-
> tion of competing waters, all sold under the general name of "Hunyadi,"
> has since that time very largely increased.    *Held*, that by the failure of
> the owner of the wells to take action, either by himself or through the
> corporation, for the protection of his rights, he abandoned all exclusive
> claim to the use in the United States either of the trade name or the trade
> label.[1]

Appeal from the Circuit Court of the United States for the Southern
District of New York.

These were four suits in equity, brought by Emilie Saxlehner against
the Eisner & Mendelson Company, the Siegel-Cooper Company, Rudolph
Gies, and Louis Marquet, to enjoin an improper use of trade marks
and labels in connection with certain Hungarian mineral waters.
From the decree of the circuit court in each case (88 Fed. 61), com-
plainant appeals, and in the first-named case defendant also appeals.

> Of these four suits, the first is one against a wholesale dealer in imported
> Hungarian mineral waters, which it offers for sale as "Hunyadi Matyas,"
> and as "Hunyadi Laszlo," and puts up with wrappings and labels simulating
> complainant's.    The other three suits are against retail dealers.    The com-
> plainant sought to enjoin the use of the name "Hunyadi," with or without
> prefix, and also to enjoin the use of any label simulating the well-known red
> and blue label of "Hunyadi Janos" water, which water complainant owns
> and controls.    The circuit court, at final hearing, upon pleadings and proofs,
> dismissed the bills as to the name "Hunyadi."    It sustained them as to the
> label, except that it held that the use by defendants of a certain additional
> label, known as the "seal label," sufficiently differentiated the goods offered
> for sale.    The complainant has appealed in all four cases, and the defendant
> in the first case has appealed from so much of the decree as finds that the
> complainant is entitled to the exclusive use of the red and blue label, and
> that defendant should account for sales under that label prior to the introduc-
> tion of the "seal label."

Antonio Knauth and Joseph H. Choate, for complainant.
Edmund Wetmore, for defendants.

Before WALLACE and LACOMBE, Circuit Judges.

[1] As to laches as a defense, see note to Taylor v. Sawyer Spindle Co., 22
C. C. A. 211.

LACOMBE, Circuit Judge (after stating the facts). The opinion of the judge who heard the cause in the circuit court is most careful and exhaustive. The voluminous facts are most fully rehearsed, and an examination of the record shows that they are accurately stated. Indeed, we do not understand that the appellant controverts so much of the opinion. It would be a waste of time to rehearse all these facts here. The opinion of the circuit court is reported in 88 Fed. 61, and may be there consulted. We concur in the conclusion of that court that when these suits were begun, in 1897, complainant was not entitled to the exclusive use in this country of the word "Hunyadi," which had before that time become a general name properly applicable to Hungarian bitter waters, so long as they were differentiated from each other by distinctive individual names, such as "Hunyadi Janos," "Hunyadi Matyas," "Hunyadi Arpad," etc. This conclusion is reached, not upon any theory that the Apollinaris Company was the agent of complainant and her predecessors, but because the latter's acts and inaction alike make out a case of abandonment. In 1876 the original Saxlehner made a contract with the Apollinaris Company whereby he gave to them the exclusive sale of his Hunyadi János bitter water in the United States; that is, he sold to them all they required, and agreed to sell to no one else in the United States, and not to sell for export there. Thereupon he devised the red and blue label for use on his bottles sold in the United States, placing upon it a notice signed by himself that "imitation of this water, or of the label, or of the capsule, will be the subject of legal proceedings at the instance of the Apollinaris Company." Down to 1886 all went well, and at that time the name "Hunyadi" (the short form used in common speech) was in fact the established trade mark of the Janos water, and the red and blue label its distinctive trade dress. At that time a few cases of other bitter water—"Matyas" and "Arpad"—appeared, and were offered for sale as "Hunyadi Arpad" and "Hunyadi Matyas," whereupon the Apollinaris Company secured injunctions against their sale. These injunctions, however, were dissolved, and the suits discontinued in 1888. From that time on, competition steadily increased. As the circuit court found:

"After the dissolution of these injunctions, the Hunyadi Arpad and the Hunyadi Laszlo waters were sold in this country, * * * and also, to a limited extent, the Hunyadi Bela water, all under the general name of 'Hunyadi,' and with the imitation red and blue labels."

In 1890 the Eisner & Mendelson Company began the sale of Hunyadi Matyas, under labels closely simulating complainant's, and vigorously pressed the sale of it. The importations of competing waters into the United States from 1888 to 1895, all sold as Hunyadi water, whether Arpad, Matyas, Laszlo, or what not, and nearly all offered under the red and blue labels, aggregate as follows: In 1889, 7,649 cases (50 bottles each); in 1890, 10,789 cases; in 1891, 9,610 cases; in 1892, 11,899 cases; in 1893, 8,156 cases; in 1894, 12,570 cases; in 1895, 6,244 cases. To check this appropriation of his trade name and trade label in the United States, Saxlehner, for nearly nine years, —from the dissolution of the injunctions, in 1888, down to the begin-

ning of these suits, in 1897,—did absolutely nothing. The Apollinaris Company, whom he had, over his signature, proclaimed to the world as the suppressor of infringements, did take action, but not in the line of maintaining the trade name. In 1889, and again in 1890, that company announced that it had adopted an additional trade mark of selection (a red diamond) which was to distinguish the Hungarian aperient water sold by it, and that it did so for the reason that numerous aperient waters are offered to the public under names of which the word "Hunyadi" forms a part. In 1893 the Apollinaris Company issued a further circular, in which it stated that "the word 'Hunyadi' having become a general name for Hungarian bitter waters, good, bad, and indifferent, the Apollinaris Company has affixed to the bottles of Hunyadi Janos water the red diamond," etc.

In view of these facts, of the continued and increasing appropriation by competitors of his label and of his trade name (as a general designation), can a complainant who has for nine years done nothing towards maintaining or even asserting his original rights now be heard to suppress the competition which his supineness has allowed, and indeed invited and encouraged, to grow up? We think not. The case at bar seems to be one of those exceptional ones referred to in Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, where delay or acquiescence has been continued so long and under such circumstances as to defeat the right itself. Nor is the situation changed by Saxlehner's absence abroad. If he had chosen to sell his own goods in this country, thus becoming a dealer here, familiar with the conditions of the business, he must inevitably have acquired the knowledge as to appropriation of the name and label which the Apollinaris Company acquired; and if, with such knowledge, he went on year after year without even giving notice of dissent and nonacquiescence, there would surely come some time when he must be held to have abandoned his exclusive claims. And he cannot avoid the imputation of such knowledge merely by selling his entire importation to a single person, leaving to that person the distribution of the goods to the trade here. If he wished to hold on to his trade name and trade label in this country, he should either have taken steps to advise himself as to the situation, or should have seen to it that his selected vendee, who shared with him in his monopoly, took proper action to maintain his rights.

The circuit court reached the conclusion that, although the trade name "Hunyadi" had thus been abandoned to the public, the same was not true of the red and blue label, founding the distinction on the "positive action" of the Apollinaris Company in making the declarations above quoted. Inasmuch as the company was not Saxlehner's agent, he cannot fairly be held to be bound by any "positive action" of theirs of which he was not advised; but, as above stated, he is chargeable with their failure to act as much as with his own, and must be held to have abandoned all exclusive claim to the use in the United States either of the trade name or the trade label. The decree of the circuit court is affirmed as to the name "Hunyadi," but modified so as to dismiss the bill as to the red and blue label, with costs of this appeal to defendants.

## Motion for Reargument.

(January 25, 1899.)

PER CURIAM. We are unable to assent to the proposition that the provisions of the treaty are to be construed so as to hold that when the public in this country has acquired, through the owner's laches, the right to use a trade-name and a trade-mark, such right is abrogated whenever, by the operation of some subsequent Hungarian law, the trade-name and trade-mark is secured to him in Hungary. For that reason petition for reargument is denied.