## A. BOURJOIS & CO., Inc., v. KATZEL. *

(Circuit Court of Appeals, Second Circuit. June 8, 1921. On Petition for Rehearing June 30, 1921.)

### No. 252.

Trade-marks and trade-names ⬉64—Use of trade-mark by competitor on genuine article not infringement.

The importation and sale in the United States of an article made in a foreign country, bearing the trade-mark under which it is known and sold in the country where made, and also in this country, is not an infringement of the American trade-mark on the same imported article though that is owned by a competitor.

Hough, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by A. Bourjois & Co., Inc., against Anna Katzel. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 274 Fed. 856.

John B. Doyle, of New York City (John R. Rafter, of New York City, of counsel), for appellant.

Briesen & Schrenk, of New York City (Hans v. Briesen and William A. Redding, both of New York City, of counsel), for appellee.

Before WARD, HOUGH, and MANTON, Circuit Judges.

WARD, Circuit Judge. In July, 1913, the plaintiff, a corporation of the state of New York, bought the business and good will in the United States of A. Bourjois & Cie., E. Wertheimer & Cie., Successeurs, a French firm which had since 1879 sold in the United States a face powder manufactured by it in France described as "Java." The French firm registered in the United States Patent Office the trade-mark "Java" in 1888, the trade-mark "A. Bourjois & Cie." in 1908, and the word "Java" on the top and side of its box in 1912. The plaintiff in 1916, 1918, and 1919 registered three other trade-marks used by the French firm for face powder. Under all these trade-marks the plaintiff imports in bulk the face powder manufactured by the French firm, and packs and sells it here in boxes.

The defendant conducts a retail pharmacy in New York City, and sells in New York, New Jersey, and other states the same genuine face powder manufactured by the French firm, imported by her in its original boxes, on which are printed its trade-marks and labels. The only difference between the trade-mark and labels of A. Bourjois & Co., Inc., and A. Bourjois & Cie., E. Wertheimer & Cie., Successeurs, is that the powder sold by the defendant is called Poudre de Riz de Java, as the plaintiff called it until 1916, when it altered the name to Poudre Java, and that on the bottom of the plaintiff's boxes is printed "Trade-Mark Reg. U. S. Pat. Off. Made in France—Packed in the U. S. A. by A. Bourjois & Co., Inc., of N. Y., Succ'rs in the U. S. to A. Bourjois & Cie. and E. Wertheimer & Cie."

The plaintiff filed this bill on the ground of infringement of its registered trade-marks, praying that the defendant be enjoined both provisionally and finally from selling the French firm's face powder under the trade-mark "Java" or the trade-mark "Bourjois," or under any of the plaintiff's registered trade-marks and for an accounting. The District Judge granted the motion for a preliminary injunction, and the defendant appeals from that order.

It is to be noticed in the first place that, the residence and citizenship of both parties being in the state of New York, no question of unfair competition is involved, and indeed there is no evidence of any such competition.

The assignment from A. Bourjois & Cie., E. Wertheimer & Cie., Successeurs, to A. Bourjois & Co., Inc., is not produced, but we assume for the purposes of this case that the plaintiff is entitled to the French firm's trade-marks under Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, 32 L. Ed. 526, and Wertheimer v. Batcheller (C. C.) 185 Fed. 850, and that it would be a breach of the French firm's obligations to sell its face powder in this country. Le Page v. Russia Cement Co., 51 Fed. 941, 2 C. C. A. 555, 17 L. R. A. 354.

We set on one side all authorities cited by the plaintiff arising out of sales under the same trade-marks of two different competitive articles manufactured by different persons, such as Hanover Milling Co. v. Metcalf, 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 713; Scandinavia Co. v. Asbestos Co., 257 Fed. 937, 169 C. C. A. 87, because it is quite clear that the defendant could not sell face powder manufactured by her or by any other person than A. Bourjois & Cie. under these trade-marks. But the article sold by the plaintiff and covered by its registered trade-marks is the face powder actually manufactured by the French firm, imported in bulk and packed here by the plaintiff, which is the precise article imported by the defendant in the French firm's original boxes and sold here. The question is whether the defendant has not the right to sell this article under the trade-marks which truly indicate its origin. We think she has. The question has been so decided in three cases in this circuit, Apollinaris Co. v. Scherer (C. C.) 27 Fed. 18; Russian Cement Co. v. Frauenhar, 133 Fed. 518, 66 C. C. A. 500; and Gretsch v. Schoening, 238 Fed. 780, 151 C. C. A. 630.

In the Apollinaris Case Saxlehner, owner of the Hunyadi Janos

spring in Hungary, gave to the Apollinaris Company the exclusive right to sell the water under the trade-mark "Hunyadi Janos" in Great Britain and the United States. The Apollinaris Company registered the name and the label as trade-marks in the United States Patent Office. Scherer applied to Saxlehner to sell him the water for importation into the United States, which Saxlehner refused to do, telling him of the Apollinaris Company's exclusive rights. Thereafter Scherer purchased the water from other parties in Germany, imported it into the United States, and sold it under the name Hunyadi Janos and with the same label as the Apollinaris Company's with one immaterial variation. Judge Wallace said:

"The complainant established an agency for the sale of the water in this country, but, as it now asserts, is unable to maintain its own prices for the article because the defendant purchases the water in Germany from persons to whom it has been sold by Saxlehner, imports it, and sells it here at lower prices. It is shown that the defendant purchases the water in bottles under the label adopted by Saxlehner containing the cautionary notice, and that he does this after having applied to Saxlehner to sell him the water and been refused and informed by Saxlehner of the complainant's rights.

"The bill of complaint proceeds in part upon the theory that the defendant is infringing the complainant's trade-mark in the name and label applied to the water, but all the averments in this behalf may be disregarded as irrelevant to the real question in the case. No doubt is entertained that the name when applied to the water is a valid trade-mark, and that the complainant should be protected against the unauthorized use of the trade-mark by another. The complainant would be entitled to this protection entirely irrespective of the registration of its trade-mark in the patent office. The same observations apply to the use of the label. The complainant has a common-law right to the name and the label as a trade-mark by which its mineral waters are identified; and as the necessary diversity of citizenship exists between the parties to confer jurisdiction upon this court, the only effect of registration is to afford and perpetuate the evidence of the complainant's title. But the defendant is selling the genuine water, and therefore the trade-mark is not infringed. There is no exclusive right to the use of a name or symbol or emblematic device except to denote the authenticity of the article with which it has become identified by association. The name has no office except to vouch for the genuineness of the thing which it distinguishes from all counterfeits; and until it is sought to be used as a false token to denote that the product or commodity to which it is applied is the product or commodity which it properly authenticates, the law of trade-mark cannot be invoked.

"The real question in the case is whether the defendant is unlawfully interfering with any exclusive right of the complainant to control the sale of the water in the territory ceded to the complainant for that purpose by Saxlehner. It is manifest that the acts of the defendant tend to deprive the complainant of the substantial advantages which it expected to obtain from the privilege transferred to it by Saxlehner. It can no longer maintain its own prices for the mineral water or hold out the inducements it formerly could to the agents it has selected to introduce the article to the patronage of the public, and build up a trade. It can no longer protect itself as efficiently against the chances of a spurious article being palmed off upon the public as its own. It is therefore measurably deprived by the acts of the defendant of the profits and benefits which it contemplated when it purchased from Saxlehner the exclusive right of importing the water into this country and selling it here. If the complainant could acquire an exclusive right to sell the water here the case would be plain. If it could not it still remains to consider whether the defendant has violated any duty which the law recognizes in his relations to the transactions. There would seem to be no doubt that the agreement between Saxlehner and the complainant was a valid one. He had

the right to dispose of his property in the product of his spring as he saw fit, and it is not apparent how the transfer of a part of his exclusive right to vend the water by which a territorial division in its enjoyment was created, can be deemed obnoxious to any principle of public policy as tending to create a monopoly or an unlawful restraint of trade. If Saxlehner were now endeavoring to compete with the complainant in the sale of the water in the ceded territory, his conduct would furnish a ground for equitable jurisdiction and the remedy of an injunction because of the inadequacy of a remedy at law, Bisp. Eq. 463. It is equally clear that if the defendant were co-operating with Saxlehner collusively to violate the complainant's right to the exclusive sale of the water he also would be restrained. In such a case the foundation of equitable redress would be the breach of covenant on the part of Saxlehner, and the defendant when acting in aid would be identified with Saxlehner and amenable to the remedy as though he were Saxlehner himself. But it is important to bear in mind that the case would become for equitable cognizance, and the remedy of an injunction merely upon the ground that the complainant's damages arising from the breach of covenant could not be reparably redressed at law."

In the Russia Cement Co. Case, 133 Fed. 518, 66 C. C. A. 500, the defendant bought in bulk of third parties glue made and sold by the plaintiff under the trade-name of "Le Page's Glue" and bottled and sold under that name. We said:

"Counsel for complainant argues that defendants should be enjoined from applying the name 'Le Page' to a glue made by complainant, which is inferior to the most expensive brands sold by complainant under that name, on the ground that this is a gross fraud and an imposition upon the public. How such conduct constitutes a fraud upon the public does not appear from the evidence. The labels on defendants' bottles contain no statement as to whether the glue put up by it is either of a superior or inferior quality, but merely that this glue is manufactured by complainant and is bottled by defendants, and that 'this glue is known all over the world as the best for cementing wood, leather, glass,' etc. If the public gets an inferior quality of glue when it purchases that bottled by defendants it is because the complainant has seen fit to sell such glue under the same trade-name as it had applied to a superior article, and has chosen thus to reap the profit from the sale to the public of two qualities or grades of the same article under the same trade-name. A court of equity will not enjoin a person from affixing to goods solds by him their true name and description, in the absence of any evidence of an attempted fraud, such as by representing his goods as of a different origin or quality or manufacture from what they actually are. The case of Gillott v. Kettle, 3 Duer, 624, cited by complainant as 'very close in point,' illustrates the rule and its application. There the defendant removed, the labels from an inferior quality of pens manufactured by complainant, and affixed other labels which imitated the labels on a superior quality of pens made by complainant. The court held that 'by such a practice the defendant endeavors by a false representation to effect a dishonest purpose; he commits a fraud upon the public and upon the manufacturer.' But here there is no false representation by spurious label or false statement. The label tells the truth, and nothing but the truth. There is no fraud upon the public, for it gets the genuine, identical thing described by the label (Apollinaris Co. v. Scherer [C. C.] 27 Fed. 18); there is no fraud upon the manufacturer, for its vendees resell its manufacture, to which it has applied its name (Vitascope Co. v. United States Phonograph Co. [C. C.] 83 Fed. 30), coupled with the statement that it (the vendee) is responsible for the bottling of the manufacture."

In the Gretsch Case the Gretsch Company had the exclusive agency for the United States of the sale of violin strings made in Germany by Mueller under the name "Eternelle," and with Mueller's approval registered the name as the trade-mark in the United States Patent

Office. Schoening purchased such strings in Germany, and imported them into the United States. The case arose under section 27 of the Trade-Mark Act (Comp. St. § 9513) as to. the importation of merchandise copying or simulating a trade-mark registered in the United States Patent Office. After referring to the two foregoing cases we said:

"The rationale of both decisions is that the defendant in each case was selling the genuine article identified by the trade-mark and the public was not misled, but was getting exactly what it paid for. These decisions, however, were made before the act in question was passed. Assuming that Congress could protect the owner of a registered trade-mark against the importation by third parties of the genuine article under that trade-mark, has it done so? We think not. The act prohibits the entry of imported merchandise which shall 'copy or simulate' a trade-mark registered under it. The obvious purpose is to protect the public and to prevent any one from importing goods identified by their registered trade-mark which are not genuine. In this case, however, the imported goods were the genuine articles identified by the trade-mark. We assume that Schoening has a valid trade-mark, even if he does not manufacture the strings (Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, 32 L. Ed. 526), applying to the whole of the United States, and still are of opinion that it is not infringed by one who buys in Germany the genuine article identified by the trade-mark, imports it into the United States, and sells it so marked here."

The analogy between patents and trade-marks is not complete. A patent gives the patentee a monopoly to make, sell, and use and grant to others the right to make, sell, and use the subject patented in the United States for the term of the patent. Hence articles lawfully made, used, and sold in foreign countries cannot be sold in this country if they infringe the patent. Trade-marks, on the other hand, are intended to show without any time limit the origin of the goods they mark, so that the owner and the public may be protected against the sale of one man's goods as the goods of another man. If the goods sold are the genuine goods covered by the trade-mark, the rights of the owner of the trade-mark are not infringed.

The order is reversed.

HOUGH, Circuit Judge (dissenting). The majority opinion states as the question in this case whether defendant "has not the right to sell this article under the trade-marks which truly indicate its origin." With this statement I agree, but disagree with the meaning given by the decision to the word "origin."

It is not yet settled whether a trade-mark is to be primarily regarded as protecting the trade-mark owner's business from a species of unfair competition, or protecting the public from imitations.

The decision in this case seems to me to lean the wrong way, because in my opinion a trade-mark is primarily a protection to the owner's business. It is attached to the business, is a part of it, and cannot be detached therefrom; there being no such thing as the transfer of a trade-mark in gross. If this be true, it makes no difference whether the plaintiff's business grew out of an agency for another, provided only that it be shown that it is an honest business and belongs to the person who attached, and (perhaps) duly registered the trade-mark, which describes the product of that business.

This plaintiff made a business in Java powder. It is an honest business, and whatever rights the French manufacturer had in the United States became the rights of the plaintiff. If, therefore, the primary function of the trade-mark is to protect this plaintiff's business in his own country, it makes no difference at all that the genuine French article is the thing offered by defendant. That genuine article has become an infringement because the business of dealing in that article within the United States is the plaintiff's business.

### On Petition for Rehearing.

Hans v. Briesen, of New York City (William A. Redding, of New York City, of counsel), for petitioner.

L. E. Varney, of New York City, amicus curiæ.

PER CURIAM. We are asked to certify the question involved in this case to the Supreme Court on the ground of its supreme importance in view of the many businesses with their accompanying trade-marks of German citizens, bought during the European War by citizens of this country from the Custodian of Alien Property.

It is not doubted that an American citizen may buy the business of a foreigner in the United States, with its accompanying trade-marks, and, having done so, may subsequently change the character and quality of the goods at pleasure. But that is not this case. The owner of the trade-mark cannot change them and still assert that they are the actual goods manufactured by the foreigner and imported by him. Such a misrepresentation would deprive him of the protection of the law.

The precise question decided by us has been misapprehended. The trade-marks and labels complained of are those of the French house, and the plaintiff asserts that it is selling under them face powder manufactured by the French house in France and imported by it in bulk and repacked here. It treats this repacking as a very material consideration. The defendant says that this is precisely the product made by the French house in France and imported by her in the boxes of the French house with the same trade-marks and labels, which she is selling here.

If in the case of Menendez v. Holt, Holt had asserted that he was selling the flour under the trade-mark Favorita which had been made by a miller under that trade-mark, the case would be more like the one under consideration.

It is sought to distinguish the three cases decided in this circuit, which we have followed, upon what we think a misapprehension of their facts.

It is said that in the Apollinaris Case that company was the mere agent of Saxlehner. This is not so. The company bought the genuine spring water from Saxlehner, imported it into the United States, and sold it here as the water of that spring. All that it owed Saxlehner was the price it agreed to pay; there was no relation whatever of agency. Judge Lacombe, in Saxlehner v. Eisner & Mendelson Co., 91 Fed. 538, 33 C. C. A. 291, and Mr. Justice Brown in Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60, both said that the company was not Saxlehner's agent.

In the Le Page Case it is said that the plaintiff owner of the trademark sold the Le Page glue to the defendant. This is not so. The plaintiff refused to sell to the defendant, who thereupon bought the glue from third parties in bulk and rebottled it.

So in the Gretsch Case it is said that Schoening was merely the exclusive agent of Mueller for the sale of his violin strings called "Eternelle," in the United States. The District Judge found that there was an exclusive agency, though the evidence on the subject was very meager, and we, assuming that to be true and also that Schoening had a valid trade-mark, held nevertheless that Gretsch could lawfully import Mueller strings from Germany and sell them here.

The petition is denied.