**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 92-2266

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

EIGHTY-THREE ROLEX WATCHES,

Defendant,

VERSUS

SAM'S WHOLESALE CLUB AND WAL-MART STORES, INC.,

Claimants-Appellants.

---

Appeals from the United States District Court
For the Southern District of Texas
(May 21, 1993)

(                         )

Before REYNALDO GARZA, HIGGINBOTHAM, and DeMOSS, Circuit Judges

DeMOSS, Circuit Judge:

### I.  Background

This appeal involves a forfeiture of 83 Rolex Watches, so-called "gray market" goods, in the inventory of Sam's Wholesale Club.  Sam's Wholesale Club and Wal-Mart Stores, Inc., its parent, (collectively, Wal-Mart) intervened as owner of the watches.  On

cross-motions for summary judgment, the district court ordered forfeiture.  We affirm.

## A.  Statute and Regulations

Section 526 of the Tariff Act of 1930, 19 U.S.C. § 1526, prohibits the importation of any merchandise bearing a trademark "owned by a citizen of, or by a corporation . . . created or organized within, the United States," and registered in the Patent and Trademark Office by a person domiciled in the United States, without written consent of the domestic trademark owner.

Customs regulations provide that the § 526 import prohibition is inapplicable if "both the foreign and the U.S. trademark . . . are owned by the same person or business entity," or if "the foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control."  19 C.F.R. § 133.21(c)(1) and (2).  The regulations define "common ownership" as "individual or aggregate ownership of more than 50 percent of the business entity."  "Common control" is defined as "effective control in policy and operations and is not necessarily synonymous with common ownership."  19 C.F.R. § 133.2 (d) (1) and (2).

## B.  Rolex

On March 15, 1983, Rolex Watch U.S.A. Inc., a New York corporation (Rolex USA), recorded its ownership of the "ROLEX" trademark with Customs.  The recordation form stated that Rolex USA consented to importation of two articles "bearing the 'ROLEX' trademark" upon entering the United States if for personal use and

2

not for sale, but that otherwise importation of these articles was forbidden unless consigned to or for the account of Rolex USA.

On June 16, 1986, Customs sent attorneys for Rolex USA a letter, advising that Customs had decided "not [to] continue to provide protection to Rolex Watch, U.S.A., Inc., against the importation of genuine "ROLEX" watches (so-called "gray market" goods)." Customs denied continued protection because Rolex USA "is under common ownership or control, either beneficial and/or legal, with a foreign company owning the trademark abroad in circumstances similar to those found by the U.S. District Court in Parfums Stern, Inc. v. United States Customs Service, 575 F. Supp. 416 (U.S.D.C. S.D. Fla. 1983)."[1]

In response, the Rolex USA attorneys filed a submission contending that Customs should continue to protect Rolex USA against unauthorized gray market imports because Rolex USA is not under common ownership or control with the foreign Rolex trademark owner. The submission explains that the Swiss manufacturer of Rolex watches, and the owner of the Swiss "ROLEX" trademark, is Manufacture des Montres Rolex S.A. Bienne (Bienne). Bienne has assigned the U.S. Registration for the "ROLEX" mark and good will to Rolex USA. The worldwide distributor of Rolex watches manufactured by Bienne is Montres Rolex S.A. (Geneva) located in Geneva, Switzerland. Bienne has authorized Geneva to obtain

---

[1] In Parfums Stern, the district court denied protection to the domestic trademark owner because it and the foreign trademark owner were part of a "single international enterprise." 575 F. Supp. at 420.

3

various registrations for Rolex combination marks in Switzerland, such as Rolex Crown, Tite Fit and Oyster Perpetual. However, under Swiss law, Bienne remains the owner of the "ROLEX" trademark.

Geneva and Rolex USA are under common ownership. Rolex USA is wholly owned through two intervening subsidiaries (Rolex Industries, Inc. and Rolex Holdings, S.A.) by the Wilsdorf Foundation of Geneva, Switzerland (Wilsdorf). Wilsdorf also owns 86% of Geneva. By contrast, the only link between Bienne and Geneva is a shareholder, Dr. Harry Borer, who owns a mere 26 shares of Geneva, representing .43% of Geneva's 6000 outstanding shares. Dr. Borer is a also shareholder, officer and director of Bienne. Wilsdorf, however, owns no shares of Bienne. Bienne has a five-member board of directors of which no member sits on the boards of Geneva, Wilsdorf or Rolex USA. Bienne has seven officers none of which is a director or officer of Geneva, Wilsdorf, or Rolex USA. Bienne and Geneva, however, jointly own Rolex Le Locle S.A. (Le Locle), which owns the building in Le Locle, Switzerland, where Geneva and Bienne each lease separate premises.

In addition to addressing the issue of common ownership and control, the Rolex USA submission to Customs contended that gray market imports undercut its investment in customer goodwill associated with the "ROLEX" trademark. Rolex USA contended that gray market importers provide inferior inspection and testing of the watches, substitute nongenuine watch parts, and provide inferior warranty service and parts replacement. Rolex USA asserted that gray market importers unfairly compete by taking a

"free ride" on Rolex USA's goodwill, without incurring the advertising and quality control costs.

In response to the submission, Customs reversed its position and decided to continue protecting the "ROLEX" trademark under § 526. Customs then pursued this forfeiture of 83 Rolex watches from the inventory of Sam's Wholesale Club, which were imported without Rolex USA's permission. The parties stipulated that the watches were manufactured by Bienne and sold by Geneva, and that Geneva's company name ("Montres Rolex, S.A., Geneva") is imprinted on every watch casing.

## C. District Court

The district court held on cross-motions for summary judgment that the watches should be forfeited under § 526. As for the regulatory exception, the district court held that Wal-Mart failed to show that Rolex USA and Bienne, the domestic and foreign owners of the "ROLEX" mark, were subject to common ownership or control. Significantly, the district court found that the mark at issue is the "ROLEX" mark, owned by Bienne, not the combination mark "Rolex Crown", owned by Geneva. The court reasoned, "as long as the 'Rolex' mark is on the watch, the importer must first obtain Rolex USA's permission." Rec. Vol. 6 at 377.

## II. Analysis

Wal-Mart's arguments for reversal are as follows. Initially, Wal-Mart contends that Rolex USA, as a foreign-owned corporation, is not entitled to § 526 gray market protection. Alternatively, Wal-Mart argues that the Rolex entities are subject to common

5

ownership or control and therefore fall within the regulatory exception to the statute.  Finally, Wal-Mart submits that it is an "innocent owner" of the watches, and forfeiture is inappropriate.


### A.  Applicability of § 526

Wal-Mart first asks this court to narrow the protection afforded by § 526.  Wal-Mart argues that Congress in § 526 intended only to protect domestic companies and not foreign-owned companies such as Rolex USA.  Wal-Mart asserts that the Supreme Court in K-Mart Corp. v. Cartier, Inc.[2] interpreted the phrase in § 526, "a trademark owned by a . . . corporation created or organized within, the United States" to mean an exclusively American corporation and not one, such as Rolex USA, that is a wholly-owned subsidiary of a foreign-based conglomerate.  Wal-Mart's argument, however, misconstrues the holding in K-Mart and ignores the history and development of the Tariff Act, the Customs regulations and the related case law.[3]

---

[2] 486 U.S. 281, 290, 108 S. Ct. 1811, 1817, 100 L. Ed. 2d 313 (1988).  The Court held that the Customs Regulations 19 C.F.R. § 133.21 (c)(1) and (2) were consistent with § 526.

[3] "Although the plain language of a statute should be the starting point to determine Congressional intent, statutory language cannot control if clearly demonstrated Congressional intent requires a different construction. Legislative history is important evidence of Congressional intent.  And in construing a statute, the administrative practice of the agency charged with administering the statute is entitled to substantial deference. Therefore, a careful examination of the legislative and administrative history is essential in determining the intended scope of § 526."  Vivitar Corporation v. United States, 593 F. Supp. 420 (C.I.T. 1984) (citations omitted); aff'd, 761 F.2d 1552 (Fed. Cir. 1985).

First, Wal-Mart mischaracterizes the holding in K-Mart where the Court was faced with a challenge to the validity of the regulatory exceptions.  The K-Mart court gave several examples of how trademark owners can be subject to gray market imports.  The court analyzed each of the gray market examples and concluded that Congress intended not to protect subsidiaries of foreign manufacturers from parallel imports.  Justice Brennan in his concurrence reasoned that the statute's protectionist, "almost jingoistic, flavor" bespeaks an intention not to protect a subsidiary created here to register the trademark on the parent's behalf, but he was considering the case where the foreign parent also owned the trademark.  Id. at 1821 (Brennan, J. concurring).[4] This holding, however, cannot be construed to exclude Rolex USA from § 526 protection.[5]

---

[4] ". . .it will not even suffice for the foreign manufacturer to incorporate a subsidiary here to register the trademark on the parent's behalf, if the foreign parent still owns the trademark." Id. 108 S. Ct. at 1821 (Brennan, J. concurring).

[5] Wal-Mart also cites that two other cases to support its argument that a foreign related company can not avail itself of § 526 protection.  Parfums Stern v. United States Customs Service, 575 F. Supp. 416 (S.D.Fla. 1983); Vivitar Corp. v. United States, 593 F. Supp. 420 (C.I.T. 1984), aff'd, 761 F.2d 1552 (Fed. Cir. 1985), cert. denied, 474 U.S. 1055 (1986).  These cases are inapposite.

In Parfums Stern, a corporation that owned the U.S. trademark and license to manufacture and distribute talcum powder, sued challenging importation of fragrances bearing the trademark.  The court found that the "American" plaintiff was, in fact, "a cog or entity in what appears to be a single international enterprise operating through an amoeba-like structure." Id. at 418.  The court refused to grant an injunction against gray market importation.  In Vivitar, the Court of International Trade refused to issue a declaratory judgment to exclude all imports of genuine Vivitar products without the consent of the U.S. owner of the mark.  The source of the gray market goods was the parent company of the

7

Second, Wal-Mart ignores the development of § 526 and its related regulations.  Section 526 was first enacted as part of the Tariff Act of 1922 to reverse the effect of a Second Circuit case, A. Bourjois & Co. v. Katzel, 275 F. 539 (2d Cir. 1921), rev'd, 260 U.S. 689 (1923).  In that case, the court declined to enjoin the parallel importation of goods bearing a trademark that a domestic company had purchased from an independent foreign manufacturer at a premium.  In Katzel, the domestic company seeking protection was a "'prototypical gray-market victim' -- a United States trademark holder that purchased its trademark rights, at arm's length and at substantial cost, from an unaffiliated foreign producer."  K-Mart, 486 U.S. at 287, citing Katzel.

---

American trademark owner.
     These cases do not stand for the proposition that Wal-Mart suggests.  The Parfums Stern case does not clearly describe the type of relationship between the foreign and domestic trademark holders, but simply holds that the U.S. trademark holder was seeking the protection of the trademark laws to insulate itself from what it placed in motion itself through its own "strongly related" foreign manufacturers and distribution sources.  In Vivitar, the U.S. trademark owner marketed its equipment outside of the U.S. through its wholly-owned subsidiaries, which were not licensed to market the goods in the U.S.  This holding is fully consistent with the Customs regulations concerning common ownership and control, and the cases are not supportive of Wal-Mart's position.

8

The legislative history of § 526 clearly reveals that reversal of _Katzel_ was the purpose of the section.[6]  Senator Sutherland, a proponent of the bill, noted that:

> [A]ll that this paragraph does is to prevent fraud, and I believe that the Senate is in favor of protecting the property rights of American citizens who have purchased trade-marks from foreigners, and when these foreigners deliberately violate the property rights of those to whom they have sold these trade-marks by shipping over to this country goods under those identical marks.

_Id._ at 11603.

Shortly after § 526 became law, the Supreme Court reversed _Katzel_ and held that the Trademark Act of 1905 prohibited importation of trademark goods from a foreign manufacturer who had sold the American trademark to the plaintiff.  The court based its decision on the law governing assignment of trademark rights.[7]

Section 526 was reenacted without change as part of the Tariff Act of 1930 in the face of a proposed amendment, to encourage domestic production, that would have prohibited importation of all

---

[6] The Conference Report notes:
A recent decision of the circuit court of appeals holds that existing law does not prevent the importation of merchandise bearing the same trade-mark as merchandise of the United States, if the imported merchandise is genuine and if there is no fraud on the public.  The Senate amendment makes such importation unlawful without the consent of the owner of the American trade-mark.
H.R. Rep. No. 1223, 67th Cong., 2d Sess. 158 (1922).

[7] _A. Bourjois & Co., Inc. v. Katzel_, 260 U.S. 689, 691, 43 S. Ct. 244, 245, 67 L. Ed. 464 (1923); Trademark Act of 1905, Pub.L. No. 58-84, §10, 33 Stat. 727 (1905).  In a similar case, the Supreme Court held that §27 of the 1905 Act, 19 U.S.C. § 1124, required the same result.  _A. Bourjois & Co., Inc. v. Aldridge_, 263 U.S. 675, 44 S. Ct. 4, 68 L. Ed. 501 (1923), _answering questions certified at_ 292 F. 1013 (2d Cir. 1922).

goods bearing a U.S. registered trademark. 71 Cong. Rec. 3871 (1929).

The initial Customs Regulations promulgated shortly thereafter suggest a broad application of § 526.[8] If Customs intended a sweeping result, that view was short lived. In 1936, Customs issued a new regulation interpreting § 526. The regulation prohibited importation of U.S. registered trademarked goods but excepted goods bearing a foreign trademark which is identical to the U.S. trademark and which is owned by the "same person, partnership, association, or corporation." T.D. 48537 (1936). Therefore, § 526 protection was not extended if the same entity owned the foreign and domestic trademarks. Thus, the plaintiff in Katzel that bought certain United States trademark rights was protected from imports of genuine goods bearing the trademark of the foreign company that sold its U.S. rights.

In 1953, Customs expanded its construction of § 526 and adopted a provision denying protection to a domestic trademark owner if it was a "related company" to the foreign manufacturer.[9]

_____

[8] "Prohibition of Entry -- Entry is prohibited of imported merchandise bearing a genuine trade-mark when such trade-mark is recorded with the Treasury Department. . . " Customs Regulations of 1931, Article 518(a).

[9] The term "related company" was defined in § 45 of the Lanham Act as "any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used."
    Despite the change, it has been said that Customs interpreted the regulation in accordance with its previously stated policy. See, Vivitar, 593 F. Supp. at 430, quoting a 1951 letter written by Commissioner of Customs Frank Dow explaining Customs' policy to Senator Paul Douglas. The letter concludes the following:

10

In 1959, however, Customs revised the regulation to eliminate the related company provision and return to the "same company" formulation. The court in <u>Vivitar</u> opined that the amendment did not reflect a substantive change in Customs' policy, especially since the amendment retained the limitation based on ownership of the foreign and domestic trademark by the same person, partnership, association, or corporation.[10]

---

> However, if the United States trademark owner and the owner of the foreign rights to the same mark are one and the same person, articles produced and sold abroad by the foreign owner may be imported by anyone for the reason that the trade-mark owner has himself introduced the articles into commerce or authorized such introduction and may not unreasonably restrict the use of the product thereafter. For this purpose a foreign subsidiary or licensee of the United States trade-mark owner is considered to stand in the same shoes as such trade-mark owner.

[10] In <u>Vivitar</u>, the court quotes several letters to illustrate that Customs maintained a consistent application of the regulation even though the wording was changed. In the letters, Deputy Commissioner Flinn wrote in 1963:

> It has been the Bureau's position for many years that in permitting anyone to import merchandise manufactured or sold by the foreign parent or subsidiary corporation of an American trademark owner is the correct interpretation of section 526 . . .

In 1962 Flinn wrote:

> . . . a foreign wholly owned subsidiary and its United States parent corporation are the same corporation within the meaning of . . . [the] Customs Regulations. This interpretation has been consistently applied for some years before the insertion of the "related companies" provision in the customs regulations and since the "related companies" provision was deleted from the regulations in 1959.

In 1968, Paul K. McCarthy, Assistant Director (Restricted Merchandise) for Customs wrote:

> . . . if any goods sold to markets abroad by a foreign branch, subsidiary, or agent should be offered for importation into the United States, those goods would be considered to bear genuine . . . trademarks and would be admissible to entry. This position is based on the

11

Enacted in 1972, the current regulations 19 C.F.R.§ 133.21 (c) (1) and (2) were enacted in response to a group of antitrust cases, known as the "perfume" cases.[11]  In those cases, the district court held that § 526 did not protect a United States company against parallel imports because it was part of an international enterprise.  On appeal to the Supreme Court, the Government requested that the judgment be vacated and remanded to the district court where the government could dismiss its own case to allow legislation restricting § 526 to be submitted.  Congress, however, did not change the section.  Thereafter, the regulations were promulgated allowing the unrestricted importation of trademarked products manufactured abroad where both the foreign and American trademark rights are owned by the same company or companies under common ownership or control.

Nothing in the case law, legislative or regulatory history suggests that an American company under foreign ownership may not avail itself of § 526 protection.  We agree with the district court that in order to allow parallel imports of goods bearing the "ROLEX" mark, Wal-Mart must show that the domestic and foreign owners, Rolex USA and Bienne, are subject to the common ownership or control exception to § 526.

---

legislative and judicial history of [§ 526].

[11] United States v. Guerlain, 155 F. Supp. 77 (S.D.N.Y. 1957), vacated and remanded, 358 U.S. 915, 79 S. Ct. 285, 3 L. Ed. 2d 236 (1958), action dismissed, 172 F. Supp. 107 (S.D.N.Y. 1959).

## B. Common Ownership or Control

### 1. Which Mark?

The district court concluded that "the mark for the word `Rolex' . . . is the mark at issue." Rec. Vol. 6 at 380. The court also concluded that Bienne "has always exclusively owned the `Rolex' mark." Ibid. Therefore, Wal-Mart is required to show that Rolex USA and Bienne, the domestic and foreign owners of the "ROLEX" mark, are subject to "common ownership or control." Wal-Mart argues that this finding is clearly erroneous because in the Amended Stipulation of Facts, both parties agreed that the mark at issue was the "Rolex Crown" mark owned by Geneva, which is subject to common ownership with Rolex USA.[12] Alternatively, Wal-Mart argues that Geneva constructively owns the "ROLEX" mark. Both arguments lack merit.

The district court properly based its finding on the actual recordation document identifying Rolex USA as the owner of the rights to the "ROLEX" mark in the United States. See, Government Exhibit 1, Rec. Vol. 2 at 60. Based on this document, plus the undisputed fact that the name "ROLEX" appears on the watches, the district court correctly concluded that "ROLEX" is the mark at issue. Rec. Vol. 6 at 377.[13]

_____

[12] The Rolex Crown mark is engraved on the forfeited watches, however, the district court found that as long as the name, "ROLEX" is on the watch, regardless of its appearance in a combination mark, the importer must first obtain Rolex USA's permission or show that Bienne and Rolex USA are under "common ownership or control."

[13] The Amended Stipulation of Facts was filed September 11, 1990. The government clearly contended that "Rolex" was the mark at issue in a brief filed on November 7, 1990. The district court

Alternatively, Wal-Mart argues that Geneva is the "equitable or constructive owner" of the "ROLEX" trademark, because Bienne has authorized it to register this mark in combination with marks Geneva already owns.  This contention does not comport with either Swiss or American trademark law.  The record shows that "[t]he presumption under Swiss law is `that the first depositor of a mark is also the real owner thereof.'"  Record Vol. 3 tab 23 Gov't Exhibit 7 p. 22;  Record Vol. 3 tab 23, Gov't Exhibit 9, Exhibit H (Switzerland Trademark Act, Art. 5).  "Bienne is the owner of the earliest registration for the mark Rolex in Switzerland, Registration No. 34251 issued October 17, 1913, renewed August 22, 1974 under Renewal No. 273,292."  Record Vol. 3 Tab 23 Gov't Exhibit 7, p. 22.  Bienne's authorization of Geneva to use the mark does not alter this presumption.  "Registrations of the same mark by manufacturers or merchants `who are closely connected with each other from the economic point of view' are permitted under Swiss law." Swiss Trademark Act, Art. 6 <u>bis</u>.  Therefore, Wal-Mart's argument that Geneva constructively owns the mark has no merit.[14]

_____

did not decide the case until March 19, 1992 giving Wal-Mart ample time to assert its position or declare prejudice.

[14] Wal-Mart's assertion that under U.S. law Geneva is the constructive owner of the "Rolex" mark is equally meritless.  Wal-Mart cites dictum from an 1891 Colorado decision stating that "a corporation which succeeded to all the rights, good-will and trade of the former owner" is "treated as the equitable owner" of the trademark.  <u>Solis Cigar Co. v. Pozo</u>, 16 Colo. 388, 395, 26 Pac. 556, 558 (1891).  However, we find no evidence to support the assertion that Geneva succeeded to all the rights, good will and trade of Bienne;  indeed Bienne continues to operate as the manufacturer of the Rolex movements.  Moreover, although Bienne has authorized Geneva to obtain various registrations for Rolex combination marks in Switzerland, Geneva does not have an unlimited

14

Moreover, the presence of Rolex Geneva's name on the watch does not indicate ownership of the Rolex mark.  See, Nabisco, Inc. v. George Weston Limited, 179 U.S.P.Q. 503, 508 (Patent Office Trademark Trial and Appeal Board):  stating that "the trade name of the seller or distributor of the goods appears in conjunction with the manufacturer's trademark does not serve to divest the manufacturer of its trademark rights in said designation since the inclusion of a dealer of distributor's name serves merely to indicate from whom the product is purchased by the consumer."

In sum, the district court correctly concluded that Rolex is the mark at issue; that Bienne "has always exclusively owned the `Rolex' mark".  Rec. Vol. 6 at 380.  Consequently, Wal-Mart must show that the district court erred in holding that the regulatory exception does not apply to Bienne and Rolex USA.

2.  Common Control Between Rolex USA and Bienne

Conceding that Bienne and Rolex USA are not subject to common ownership, Wal-Mart contends that Rolex USA and Bienne are subject to common control, which means "effective control in policy and operations," based on the history and operations of the "Rolex empire."  Wal-Mart argues that all of the arms of this empire form a single organization.  Wal-Mart tries to equate the Rolex corporate arrangement to the "amoeba-like" structure referred to in

---

authorization to use the Rolex mark itself.  See, Callman, Unfair Competition, Trademarks and Monopolies, § 19.46 (stating that a license involves the transfer of something less than the entire interest, and does not affect the licensor's title).

the Parfums Stern case.[15]  Wal-Mart also asserts that Bienne and Geneva are subject to common control because Bienne manufactures the watch movements and Geneva places these movements into the watch casings it manufactures and distributes the finished product worldwide.  Wal-Mart reasons that if there were no effective common control between the operations of these two entities, no watches manufactured in Bienne would ever be sold.

Wal-Mart's arguments are not persuasive.  We simply do not find support in the legislative history or the case law for the proposition that a close and profitable business relationship amounts to "common control."

We agree that Bienne and Geneva perform essential functions in manufacturing and selling Rolex products, but this is not a basis for a finding of common control.  One court has stated that the regulatory language contemplates the sort of control that a parent corporation would exercise over a subsidiary or that a common owner might exercise over both organizations.  United States v. Eighty-Nine (89) Bottles of Eau de Joy, 797 F.2d 767 (9th Cir. 1986), citing Coalition to Preserve the Integrity of American Trademarks v. Unites States, 598 F. Supp. 844, 850 (D.C.D.C. 1984).  Wal-Mart is essentially suggesting that the relationship between the American firm and the foreign firm trademark owner need not be clearly shown; it is enough to show that the American is part of a

---

[15] Unfortunately, the basis for this description is not detailed in the Parfums Stern opinion because the facts are not recited in the published opinion.  The companies involved were simply described as "affiliated" and "strongly related."  Id. at 420.

16

larger closely knit foreign structure.  While this argument has some appeal to this court, the regulations promulgated under the statute and upheld by courts interpreting the statute focus on the ownership structure regardless of the practical realities of these business enterprises.  We will not depart from such a framework without a word from Congress.

For example an argument similar to Wal-Mart's has been rejected in Bell & Howell: Mamiya Co. v. Masel Supply Co.[16]  There, the defendant argued that the affiliations between the plaintiff, the American trademark owner, and its parent company Osawa-Japan, who traded exclusively with the foreign trademark owner, Mamiya Co, formed part of "a unified international enterprise engaged in the production and world wide distribution of Mamiya camera equipment." Id. at 1066.  Therefore, the defendant argued that the American trademark owner was not entitled to protection under § 526.  The court rejected this argument, and after describing in detail the history of the statute and regulations concluded,

> [t]his regulatory exception has no application in this case.  Mamiya Co., the owner of the trademarks in question, owns only 7% of plaintiffs stock and there is no evidence that it exerts any control over plaintiff's policies and operations.

The court found that the plaintiff was not a mere shell but a "legitimate and actual owner of the business of selling MAMIYA

---

[16] 548 F. Supp. 1063, 1065 (E.D.N.Y. 1982).

. . . products in this country." [17]  In a related case, <u>Osawa & Co. v. B & H Photo</u>, 589 F. Supp. 1163 (S.D.N.Y. 1984), Bell & Howell, renamed Osawa & Co., sued B & H Photo and Tri-State Inc., New York discount camera dealers, who were selling Mamiya equipment without authorization.  The district court granted Osawa's preliminary injunction against the defendants under § 526.  The defendant also argued that the common control exception should apply to exclude plaintiff from § 526 protection because Osawa-Japan, the exclusive worldwide distributor, not only controlled the plaintiff, but also controlled Mamiya Co., the foreign trademark owner, through its 30% ownership.  The court held that the defendants had not shown common control between Mamiya Co. and Osawa & Co., and did not accept the defendants argument that the plaintiffs had an unjustifiable monopoly on the sale of Mamiya equipment.

Wal-Mart points to <u>Weil Ceramics & Glass, Inc. v. Dash</u>, 878 F.2d 659 (3d Cir.), <u>cert. denied</u>, 493 U.S. 853 (1989) as a case suggesting common control exists if the American firm enjoys a close relationship with the foreign firm, because this "presents the potential for undesired monopoly of the domestic market."  The "close relationship" between Bienne and Geneva, according to Wal-Mart, creates the same monopoly potential.  <u>Weil</u>, however, did not

_____

[17] The Second Circuit vacated the order and remanded to the district court because the district court had failed to make the requisite findings concerning: the likelihood of irreparable harm and either the likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. <u>Bell & Howell: Mamiya Co. v. Masel Supply Co.</u>, 719 F.2d 42, 44 (2d Cir. 1983).

18

hold that a potential for monopoly alone satisfies the common control requirement. In <u>Weil</u>, the American owner of the LLADRO trademark was the wholly-owned subsidiary of the foreign manufacturer and foreign owner of the LLADRO trademark. There was common ownership in the strict sense of the term, i.e. common ownership of controlling shares of stock.

<u>NEC Electronics v. CAL Circuit Abco</u>, 810 F.2d 1506 (9th Cir.), <u>cert. denied</u>, 484 U.S. 851 (1987), also cited by Wal-Mart is similarly inapplicable. There the domestic trademark holder (NEC-USA) was a wholly-owned subsidiary of the foreign manufacturer and trademark holder (NEC-Japan); indeed, NEC-Japan's directors constituted a majority of the NEC-USA's board of directors. <u>Id</u>. at 1507. This was a clear case of common ownership and control, and is unlike the case before us.

Moreover, in <u>Lever Bros. v. United States</u>, 877 F.2d 101 (D.C. Cir. 1989), Wal-Mart correctly points out that the court assumed common control although the American trademark holder was "affiliated . . . in some manner not precisely disclosed in the record" with the foreign trademark holder. <u>Id.</u> at 102 n. 2. However, the issue of common control was conceded, as the court specifically noted. <u>Id.</u> The court ultimately declined to rule on the § 526 issue and held that § 42 of the Lanham Act barred importation of foreign goods with identical trademarks if the goods were physically different without regard to the affiliation between the foreign and domestic firms or the genuineness of the trademark. <u>Id.</u> at 111. The <u>Lever Bros.</u> court found the affiliate exception of

19

19 C.F.R. § 133.21 (c) to be inconsistent with § 42 with respect to physically different goods.

We simply find no support in the record before us that shows that Rolex USA and Bienne are subject to common control. Even though these two companies maintain a longstanding business relationship, effective control in policy and operations has not been shown. Bienne manufactures the movements of the Rolex watches which are then placed into casings manufactured and distributed worldwide by Geneva. Without more proof that Bienne and Rolex USA are subject to common control by some source other than the ties that bind two entities with a profitable business relationship, we cannot hold under the current state of the law that common control has been shown.

## C.  The Innocent Owner Defense

Wal-Mart argues that the district court erred by granting a summary judgment of forfeiture, without conducting a trial on its assertion of innocent ownership. Wal-Mart's assertion stems from dicta in <u>Calero-Toledo v. Pearson Yacht Leasing Co.</u>, 416 U.S. 663, 94 S. Ct. 2080, 40 L. Ed. 2d 452 (1974) where the Supreme Court held constitutional a Puerto Rican forfeiture statute providing forfeiture of a vessel without notice and hearing until after seizure. Police had found marijuana on the owner's yacht while in the possession of a lessee who chartered the boat. The statute did not require notice prior to seizure and did not exempt property of an owner who was neither involved in nor aware of the act of his lessee which resulted in the forfeiture. In dicta, the Court said, . . it would be difficult to reject the constitutional

20

> claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent. Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; for in such circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive.

Id. 416 U.S. at 689-90, 94 S. Ct. at 2094-95 (citations omitted). Wal-Mart also relies on a Second Circuit decision to support its assertion that there is a constitutional "innocent owner" defense to customs violations. United States v. One Tintoretto Painting, 691 F.2d 603, 607-08 (2d Cir. 1982) (owner of the painting attained ownership before the illegal importation into the U.S. and did all that reasonably could be expected to prevent the proscribed use of his property before letting another take it on commission to sell in the U.S.). However, as the Sixth Circuit recognized, both the Calero-Toledo and Tintoretto Painting cases involved situations where the owner of the property subject to forfeiture attained ownership rights prior to the illegal use of the property. United States v. One 1984 Mercedes Benz Model No. 380 SE, 836 F.2d 268, 270 (6th Cir. 1988) (stating that in those cases where the innocent owner defense was successful, the owner's rights to the property did not flow from the illegal activity itself).

By contrast, Wal-Mart's ownership of the watches arises only after the unauthorized importation. Wal-Mart seems to suggest that we apply an "innocent purchaser for value" defense here. But, the Sixth Circuit has held, in an illegal importation case that Calero-Toledo does not create this defense. See, One 1984 Mercedes Benz

21

Model No. 380 SE, 836 F.2d at 270 (no innocent purchaser defense for one who purchased vehicle from importer who falsely claimed that the vehicle was for personal use only and paid no duty because allowing defense would seriously undermine the enforcement of the customs laws).   The Sixth Circuit decision was followed by the Eighth Circuit in United States v. One Cessna Model 210L Aircraft, 890 F.2d 77, 82 (8th Cir. 1989) (alternatively holding that appellant's ownership of plane flowed from another's illegal drug trafficking and ordering forfeiture).   Since Wal-Mart purchased these watches after their unauthorized importation, we hold that no innocent purchaser or owner defense is available to Wal-Mart.   It would seem to render useless the current system of public recordation if purchasers of imported items could ignore the listings and obtain good title by simply asking their sellers, as Wal-Mart did, whether the imports were authorized.

AFFIRMED.